United States Court of Appeals,

Eleventh Circuit.

No. 97-3308.

McDONALD'S CORPORATION, Plaintiff-Counter-defendant-Appellee,

v.

Roger ROBERTSON, Marilyn Robertson, trading as McDonald's Restaurant, Defendants-Counter-claimants-Appellants.

July 28, 1998.

Appeal from the United States District Court for the Middle District of Florida. (No. 97-1189-CIV-J-10C), Ralph W. Nimmons, Jr., Judge.

Before CARNES and MARCUS, Circuit Judges, and MILLS[*], Senior District Judge.

MARCUS, Circuit Judge:

This appeal arises out of the district court's entry without an evidentiary hearing of a preliminary injunction enjoining defendant-appellants Roger and Marilyn Robertson from continuing to run a McDonald's restaurant previously franchised to them by plaintiff-appellee McDonald's Corporation. On appeal the Robertsons challenge the district court's denial of their motion for an evidentiary hearing on McDonald's motion for preliminary injunction. Additionally, the defendants argue that the district court erred in entering the preliminary injunction because, according to the Robertsons, McDonald's did not demonstrate that it had the right to terminate the Robertsons' franchise agreement, and thus, McDonald's is not likely to succeed on the merits of its case. Because no issues of material fact were in controversy when the district court ruled on the motion for preliminary injunction, we find that the district court acted well within its discretion and

---

[*]Honorable Richard Mills, Senior U.S. District Judge for the Central District of Illinois, sitting by designation.

did not err in declining to hold an evidentiary hearing. We also conclude that, based on this record, the district court properly found that McDonald's established all of the prerequisites necessary for a preliminary injunction. Consequently, we affirm.

I.

A detailed recitation of the operative facts is necessary to understanding our holding. McDonald's operates a well-known worldwide fast food business. Although it owns several of its own stores, McDonald's also sells franchises. By contract, all of McDonald's franchisees must operate their McDonald's restaurants in compliance with the "McDonald's System," a series of business practices and procedures employed, in part, to ensure uniform restaurant and food quality at all McDonald's locations.

A.

On September 1, 1971, the Robertsons acquired the McDonald's franchise restaurant located at 4227 Blanding Boulevard in Jacksonville, Florida. The Robertsons operated the Blanding Boulevard restaurant without incident for many years, and, on July 23, 1989, shortly before the parties' original franchise agreement was due to expire, the parties entered into a new twenty-year franchise agreement, consisting of a franchise letter agreement, a license agreement, and an operator's lease to the real property upon which the restaurant is located. Among other provisions, the 1989 license agreement required the Robertsons to operate their franchise in accordance with quality, safety, and cleanliness ("QSC") standards prescribed by the agreement and by McDonald's business and policy manuals. McDonald's QSC standards govern a wide array of its franchisees' business affairs, including, and of particular relevance to this case, the procedures to be followed

2

in preparing, cooking, storing, and serving food, and the cleanliness and maintenance of the physical structure.

The franchise agreement plainly gave McDonald's the right to inspect the Robertsons' franchise "at all reasonable times" for compliance with McDonald's QSC standards. Additionally, it allowed McDonald's to terminate the contract if, among other contingencies, the Robertsons failed to operate the restaurant in compliance with McDonald's QSC standards. The franchise agreement and the lease contained cross-termination provisions under which, if the franchise agreement were terminated, the lease likewise would be terminated and McDonald's would receive a right to possession. Finally, the documents provided that the Robertsons would not acquire any interest in a restaurant business similar to that of McDonald's and within ten miles of the Robertsons' franchise for eighteen months after termination of the agreement.

B.

On October 3, 1997, McDonald's filed an amended complaint against the Robertsons, alleging claims for trademark infringement, dilution and false designation of origin in violation of the Lanham Act, misappropriation of trade secrets, and breach of the covenant not to compete. The amended complaint also sought a declaratory judgment terminating the franchise agreement and ejecting the Robertsons from the disputed premises. With its amended complaint McDonald's contemporaneously filed an application for a preliminary injunction. McDonald's supported this application, which sought preliminary injunctive relief on McDonald's trademark infringement and non-competition covenant claims, with the thirteen-page affidavit of Kathy Grass, a McDonald's Business Consultant in McDonald's Tampa Bay Region. Upon receiving McDonald's motion for preliminary injunction, the district court entered an order on October 6 scheduling the motion for

3

a hearing on October 17 limited to oral argument. Additionally, the October 6 order stated, "Any materials the Defendants wish to submit in opposition to the Plaintiff's application must be filed with the Court by 5:00 p.m. on Thursday, October 16, 1997." The Robertsons filed a motion for expedited discovery and sought an evidentiary hearing on McDonald's motion for preliminary injunction. By order dated October 14, 1997, the district court denied both motions but ordered McDonald's to produce certain business manuals incorporated into the franchise agreement. On October 16, 1997, the Robertsons filed their opposition to McDonald's motion for preliminary injunction. They opposed McDonald's motion with, among other materials, the affidavit of Roger Robertson ("Robertson").

C.

Based on the affidavits of Grass and Robertson, as well as other relevant evidence, the record reveals the following undisputed facts. As a Business Consultant, Grass serves as the liaison between certain McDonald's franchisees and McDonald's and ensures that the franchisees consistently comply with McDonald's QSC standards. In her capacity as a McDonald's Business Consultant, Grass had conducted several QSC audits on the Robertsons' restaurant. Through 1994, McDonald's had rated the Robertsons' restaurant generally satisfactory in terms of QSC compliance.

On February 24, 1995, McDonald's conducted an unannounced food safety audit of the Robertsons' franchise. Notably, the audit disclosed that the Robertsons' restaurant was producing undercooked meat patties, meat patties showing pink or red interiors, and meat patties with an average internal temperature nine degrees below the internal temperature required by McDonald's to reduce the risk of bacteria. Additionally, the audit revealed that the Robertsons' restaurant had failed to complete and maintain daily food safety checklists in accordance with McDonald's

4

standards, and it had failed to maintain the shake machine refrigeration temperature at 38 degrees or lower. McDonald's reviewed the findings of the inspection with Mr. Robertson and sent him a written summary of the results, advising him of the deficiencies and recommending corrective action.

Approximately one month later, on March 21, 1995, McDonald's conducted an announced follow-up audit. The Robertsons had failed to remedy some of the deficiencies identified in the February 24 food safety audit. The inspection also disclosed additional problems. Among others, the audit revealed the following: (1) cooked meat and poultry products were being held in staging cabinets at eight and three degrees below McDonald's prescribed temperatures, respectively, raising the risk of bacteria growth; (2) equipment, including a meat staging cabinet, was not maintained in good, clean, and operable condition and repair and in compliance with McDonald's standards; and (3) towels were not being sanitized.

On September 12, 1995, the Robertsons failed still another food safety audit.[1] The auditors found several sanitation and food-handling violations, including the following: (1) the sundae machine refrigeration temperature was maintained twelve degrees above the maximum McDonald's recommended temperature, increasing the risk of bacteria growth; (2) the equipment was not kept in good, clean, and operable condition and repair (the sundae machine had bugs in it); and (3) the staff failed to maintain and use clean and sanitized towels in the grill area, thereby increasing the potential for cross-contamination. The Robertsons' restaurant also failed an audit for similar reasons on March 7, 1996. Among other deficiencies, this audit cited the Robertsons for failure to store raw

---

[1]Failure of a food safety audit denotes failure to meet McDonald's minimum operational standards.

vegetable, fish, and cheese products properly, failure to maintain equipment in a good, clean, and operable condition and repair, failure to maintain and monitor proper holding times for product, improper sanitation practices, which, McDonald's found, posed "serious public health concerns," failure to maintain various aspects of the restaurant in an acceptable condition, failure to maintain grill integrity, failure to maintain and use clean, sanitized towels in the grill and lobby areas, failure to meet finished product standards, and failure to provide timely customer service.

Twelve days later, on March 19, 1996, two McDonald's representatives visited the Robertsons and advised them that McDonald's had purchased property approximately one block away from their restaurant for the purpose of building a new restaurant. McDonald's told the Robertsons that the new location would be "much better" in terms of visibility, ease of access and physical condition.

On October 3, 1996, McDonald's conducted a "short restaurant visit" to the Robertsons' restaurant. The Robertsons received their only passing grade since 1994—an overall mark of "C." The visit revealed no significant QSC problems.

On October 31, 1996, McDonald's offered the Robertsons the opportunity to close their restaurant and to take the franchise at the new location. Because of the increased rent and service fees applicable to the new franchise, the Robertsons declined the offer. In response to the Robertsons' concerns, McDonald's offered to guarantee the Robertsons' income at the new location up to $100,000 per year. The Robertsons also declined this offer. On December 11, 1996, McDonald's offered to purchase the Robertsons' franchise for $300,000. Again, the Robertsons refused.

6

On February 19, 1997, McDonald's conducted still another unannounced inspection of the Robertsons' restaurant. This audit disclosed many of the same deficiencies uncovered during earlier audits, including, among others, improper sanitation practices that posed "serious public health concerns." Additionally, McDonald's found that the Robertsons' store failed to store raw Canadian bacon and biscuit products properly. Also, the audit revealed that the walk-in refrigerator contained several items with expired freshness codes that should have been removed and destroyed. On March 3, after several unsuccessful attempts to reach Mr. Robertson by telephone, McDonald's provided Robertson with a written summary of the restaurant visit. Grass requested that the Robertsons design an action plan for improving operations. On April 18, 1997, McDonald's again undertook an unannounced visit of the Robertsons' restaurant. Once again McDonald's found numerous sanitation, hygiene, food-handling, and QSC violations. Indeed, Grass observed the same deficiencies identified during the February 19 visit. Grass testified in her affidavit that she asked Robertson whether he had created an action plan for improving operations, but he replied that he had not. Grass also discussed the Robertsons' failure to have a manager certified in food safety through successful completion of the McDonald's ServSafe (or equivalent) food safety course.

On May 28, 1997, McDonald's delivered a "Notice of Default" to the Robertsons, informing them that their continued failure to comply with QSC standards constituted a material breach of the franchise agreement. The notice provided the Robertsons with a cure period of sixty days. Additionally, it advised the Robertsons that McDonald's would conduct an unannounced comprehensive evaluation after the sixty-day period to determine whether the restaurant had achieved satisfactory QSC ratings and an acceptable evaluation of food safety. Finally, the notice provided that if McDonald's found that the Robertsons had raised the operating standards to comply

7

with McDonald's minimum standards, the Robertsons would need to maintain satisfactory operations levels throughout the following twenty-four month period to cure the default.

During the sixty-day cure period, Grass visited the Robertsons' store on two additional occasions. Both times she again observed numerous sanitation and other food safety violations. After the cure period expired, on August 26, 1997, along with other McDonald's employees, Grass visited the Robertsons' store to conduct an unannounced comprehensive graded restaurant evaluation. During this visit, McDonald's agents recorded, among others, the following violations: (1) undercooked meat patties and meat patties with an internal temperature thirteen degrees below the required internal temperature for the safe cooking of raw meat, increasing the risk of bacteria growth; (2) improper handling of raw eggs and the failure to sanitize utensils used in the preparation of egg product, creating the risk of salmonella and cross-contamination; (3) failure to use separate Hutzler color-coded spatulas for raw and cooked egg product, posing the risk of salmonella and cross-contamination; (4) routine use of bare and unwashed hands instead of sanitized serving tools to handle food products; (5) failure to supply clean and sanitized towels for use in the grill area; (6) failure to follow sanitary procedures for washing, rinsing, and sanitizing utensils; (7) storage of dishes in a rusted shopping cart; (8) failure to cover meat and chicken patties in the freezer, increasing the risk of freezer burn and cross-contamination; (9) failure to maintain a McNugget holding cabinet properly, which shut off without warning or notice, creating the risk that cooked chicken would drop below its safe holding temperature; (10) failure to maintain the grill used in cooking meat patties, which shut off without warning or notice, posing the risk that meat patties would be undercooked; (11) failure to set the timer for the correct cooking time for meat patties, resulting in the preparation of undercooked meat patties; (12) failure to have a manager certified

8

in the ServSafe food safety course; and (13) failure to meet other QSC standards, resulting in poor food quality and service. During the August 26 audit, McDonald's also performed an annual Playplace safety survey in which it reviewed the condition of the children's play area that was part of the Robertsons' restaurant. This inspection revealed the existence of exposed play structure piping that was not covered with padding, hard, sharp plastic tie-down strips on padding that were protruding, "very dirty" plastic balls in the children's ball crawl area, loose and torn netting throughout the structure, dirty and torn surface padding, and the presence of a free-standing unguarded eight-foot high pole. McDonald's concluded that these deficiencies posed risks to children of serious injury and strangulation.

On September 24, 1997, McDonald's sent the Robertsons a Notice of Franchise Termination, which advised the Robertsons that their franchise contract had been terminated, effective at the close of the restaurant on September 24. The Robertsons refused to surrender possession of the premises and continued to operate the restaurant as a McDonald's, using various trade names and trademarks registered to McDonald's.

Finally, in reviewing the uncontested facts, we note that in his affidavit, Robertson did not in any way contest the accuracy of the inspection findings. Rather, he contended that the alleged violations were not serious and that they served as a pretext for McDonald's real reason for ending the franchise agreement—that McDonald's wanted the restaurant to occupy the different and better space at the end of the block.

D.

At the hearing on October 17, McDonald's withdrew its request for injunctive relief on its claim for breach of the non-competition covenant. Instead, McDonald's focused on its trademark

9

infringement claim. The district court found that McDonald's was entitled to the relief sought and entered a preliminary injunction enjoining the Robertsons from using any of McDonald's trademarks, trade names, service marks, and trade dress, using any signs or printed goods bearing McDonald's names and marks, occupying and operating the McDonald's restaurant premises located at 4227 Blanding Boulevard, and using, duplicating, or disclosing any of McDonald's materials received by operation of the franchise letter agreement. Additionally, the district court required the Robertsons to return all materials received by operation of the franchise letter agreement. Finally, the district court made the preliminary injunction effective upon the posting of a $300,000 bond by McDonald's. McDonald's posted the required bond. The Robertsons then appealed the orders of the district court.

## II.

We review a district court's order granting or denying a preliminary injunction for abuse of discretion. *See Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169 (11th Cir.1988) (citing *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983)).

## A.

A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989) (citing *Baker,* 856 F.2d at 169 (citing *Jefferson County,* 720 F.2d at 1519)). In this Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to

10

be granted unless the movant clearly established the "burden of persuasion' " as to the four requisites.[2] *Id.* (citations omitted).  The Robertsons challenge the district court's findings only as they relate to the likelihood of success on the merits and the threat of irreparable injury.[3]  We therefore address each in turn.

1. *Likelihood of Success on the Merits*

McDonald's probability of success on the merits at trial depends on the validity of its trademark infringement claim.  This Circuit has held that in order to prevail on a trademark infringement claim, a plaintiff must show that its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake.  *See Burger King Corp. v. Mason,* 710 F.2d 1480, 1491 (11th Cir.1983) (citing 15 U.S.C. § 1114(1)(a)), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984).  Our research, however, has not revealed any case where this Court has addressed the appropriate

---

[2]The Robertsons argue that the preliminary injunction entered in this case altered the *status quo* and thus was a mandatory injunction.  Appellants' Initial Br. at 15-16;  Appellants' Reply Br. at 1-4.  They cite *Martinez v. Mathews,* 544 F.2d 1233, 1243 (5th Cir.1976), for the proposition, "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."  Appellants' Reply Br. at 3. The Robertsons' attempt to characterize as mandatory the injunction at issue, which prohibits the Robertsons from operating the Blanding Boulevard restaurant and from using McDonald's trademarks, is incorrect.  Nor do any of the cases the Robertsons cite tend to support their contention that the injunction is a mandatory one.  *See Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (stating that a mandatory injunction orders a party to "take action" and a prohibitory injunction "restrains" a party from further action).

[3]Citing the possibility of harm to the public resulting from the possible consumption of an unsafe product, the district court found that the balance of harms and the public interest favored entering the preliminary injunction.  Although the Robertsons do not voice objections to these conclusions, we nonetheless note in passing that the record amply supports the district court's finding.

11

preliminary injunction standard for evaluating whether the defendant acted without the registrant's authorization where the defendant is a franchisee who claims that the registrant unlawfully terminated its franchise agreement.

Other Circuits, as well as district courts in this Circuit, however, have considered the question. In *S & R Corp. v. Jiffy Lube International, Inc.,* 968 F.2d 371 (3d Cir.1992), for example, the Third Circuit reviewed a district court's denial of a preliminary injunction against a Jiffy Lube franchisee. Alleging that the franchisor had breached its contractual obligations to maintain the quality of its other franchises in the area, the franchisee had stopped paying royalties to Jiffy Lube but had continued to operate its stores under the name "Jiffy Lube." The franchisee filed suit against Jiffy Lube, claiming breach of the franchise agreements. Concurrently, because of the franchisee's failure to pay royalties, Jiffy Lube instituted franchise agreement termination proceedings against the franchisee's three stores. Jiffy Lube then filed a motion for preliminary injunctive relief against the franchisee, seeking to prevent the franchisee from further use of its trademark. The district court denied Jiffy Lube's motion because it concluded that the termination dispute between the parties precluded a determination of Jiffy Lube's likelihood of success on the merits. The Third Circuit found that the district court erred in failing to address the termination dispute and held that a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor. Thus, the Third Circuit found, a franchisor is entitled to preliminary injunctive relief "if it can adduce sufficient facts indicating that its termination of [the franchisee's] franchises was proper." *Id.* at 375.

In *Computer Currents Publishing Corp. v. Jaye Communications, Inc.,* 968 F.Supp. 684 (N.D.Ga.1997), the district court considered a case where a magazine publisher brought a trademark

12

infringement action against a former licensee and sought a preliminary injunction enjoining the former licensee from using the magazine publisher's trademarks. Citing *Jiffy Lube,* the court held, "[I]n order to satisfy the first prerequisite for a preliminary injunction [likelihood of success on the merits], plaintiffs must demonstrate that, under the terms of the Agreement, they were entitled to terminate the Agreement immediately based on defendant's conduct." *Id.* at 688.

In *Burger King Corp. v. Hall,* 770 F.Supp. 633 (S.D.Fla.1991), however, another district court in this Circuit found the question of alleged wrongful franchise contract termination irrelevant to a motion for preliminary injunction seeking to enjoin a former franchisee from continuing to use the franchisor's trademarks. Rather, the court determined, "[A] terminated franchisee's remedy for wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks." *Id.* at 638. For support, this opinion, which was issued prior to, and thus, without the benefit of *Jiffy Lube,* relied on *Burger King Corp. v. Austin,* Case, 805 F.Supp. 1007 (S.D.Fla.1990), and *Cle-Ware Rayco, Inc. v. Perlstein,* 401 F.Supp. 1231, 1234 (S.D.N.Y.1975). *Cle-Ware Rayco,* in turn, simply found that the franchisee's argument that his compliance with the franchise agreement was excused by the franchisor's prior alleged breach of the franchise agreement "has little relevance on [sic] the immediate question of whether the defendant can continue to use the [trademark]." *Id.* at 1234.

In considering this issue for the first time, we find that the Lanham Act's requirement that a franchisor demonstrate that *unauthorized* trademark use occurred to prevail on the merits of a trademark infringement claim against a franchisee necessitates some type of showing that the franchisor properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the *unauthorized* use of trademarks by the former franchisee. Consequently, we are

13

persuaded by the Third Circuit's analysis and conclude that the district court correctly required McDonald's to make a showing that it properly terminated the franchise agreement.

We further find that the district court correctly concluded on the record before it that McDonald's had made a substantial showing of a likelihood of success on the merits of its claim. The record reflects that the parties did not disagree that McDonald's had conducted numerous inspections of the Robertsons' restaurant. And Robertson acknowledged that these evaluations "questioned the procedures involving cleaning, sanitizing and procedural control," Robertson Aff. ¶ 5, and that he "had a few QSC Reports in 1995 that McDonald's alleged did not meet its standards." Robertson Aff. ¶ 6. He further did not contest the fact that the audits in 1996 and 1997 turned up additional deficiencies. Indeed, nothing in Robertson's affidavit alleged that McDonald's findings during these visits were not accurate.[4] The closest Robertson's affidavit came to suggesting that the inspection findings were fabricated or exaggerated was the statement, "I became increasingly surprised by these findings, since I was operating my restaurant in the same manner and according to the same high standards for food, safety, and service that I had maintained for the past twenty six years as a McDonald's owner/operator." Robertson Affidavit at ¶ 17. Even this statement, however, does not amount to a denial of McDonald's allegations that the Robertson's restaurant failed to meet McDonald's QSC standards during numerous visits by McDonald's. Moreover, the statement is contradicted by McDonald's food safety audit findings in 1995 and 1996,

---

[4]During the oral argument on the motion for preliminary injunction, the district court asked counsel for the Robertsons to cite the portion of the affidavit disagreeing with the accuracy of the inspection reports. Counsel conceded, "We didn't make that crystal clear in the affidavit." He attempted to save his case by continuing, "I mean we'll do so now.... I'll state unequivocally, the Robertsons dispute the accuracy of those findings." Because attorneys' statements at oral argument do not constitute record evidence, the only evidence in the record does not deny McDonald's contentions that the Robertsons' restaurant experienced numerous deficiencies.

14

which the Robertsons do not dispute, that the Robertsons' restaurant had some serious food safety problems well before McDonald's proposed moving the Robertsons' restaurant.

Robertson instead focuses on the fact that McDonald's sought to secure his agreement to move to a new location, and the Robertsons rejected the offer. Thus, Robertson suggests, although the food safety issues identified by the numerous inspections and audits were really not that important to McDonald's, McDonald's nonetheless used the Robertsons' alleged food safety deficiencies as "an excuse" for terminating the Robertsons' franchise agreement because McDonald's wanted to make more money by moving the Robertsons' McDonald's to another nearby location. Even assuming, *arguendo,* that this allegation is correct, however, we find that the Robertsons' failure to comply with McDonald's QSC and food safety standards constituted a material breach of the franchise agreement sufficient to justify termination, and thus, it does not matter whether McDonald's also possessed an ulterior, improper motive for terminating the Robertsons' franchise agreement. *See Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 279 (7th Cir.1992) (citing *Patton v. Mid-Continent Systems, Inc.,* 841 F.2d 742, 750 (7th Cir.1988)) ("The fact that the Cookie Company may ... have treated other franchisees more leniently is no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket.... Liability for breach of contract is strict."). Indeed, "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor. The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated." *Jiffy Lube,* 968 F.2d at 375.

In the instant case, the district court correctly found preliminarily that the repeated alleged and unchallenged violations of McDonald's QSC and food safety standards resulted in a material

15

breach of the franchise agreement by the Robertsons. First, in the franchise contract, the Robertsons agreed that "[t]he foundation of the McDonald's System and the essence of [the franchise contract] is the adherence by [the Robertsons] to standards and policies of [McDonald's] providing for the uniform operation of all McDonald's restaurants within the McDonald's System." They also acknowledged the importance of uniformity of food specifications, preparation methods, quality and appearance, facilities, and service. The QSC and food safety standards produced by McDonald's constitute some of the "standards and policies" with which McDonald's franchisees must comply. Thus, continued violation of these standards appears to constitute a material breach of the franchise agreement. Moreover, as the district court noted, as a world-wide fast food chain, McDonald's has a clear interest in securing a uniform product and service of high quality at all of its locations. McDonald's also has a strong legal interest in avoiding disputes stemming from the cleanliness and safety of its products. Accordingly, there can be no real doubt that repeated and continued serious violations[5] of the QSC and safety standards, such as those alleged by McDonald's and unchallenged by the Robertsons, constituted material breaches of the franchise agreement warranting termination. Thus, the district court correctly found that McDonald's had a substantial likelihood of succeeding on the merits of its trademark infringement claim, as there was no dispute that the Robertsons continued to use the McDonald's trademarks, and that such use was unauthorized and was likely to have resulted in confusion.

2. *Irreparable Injury*

---

[5]While the Robertsons argue that the alleged violations were not "serious," it is difficult for the Court to conceive of substantially more serious violations than those that could jeopardize the health of the Robertsons' patrons, such as the cited undercooking of meat patties, practices resulting in possible cross-contamination of food products, and the presence of bugs in the food preparation equipment.

16

The Robertsons also contend that the district court erred in finding irreparable injury because, in other types of actions, district courts in this Circuit have held that loss of goodwill does not constitute irreparable injury. The Robertsons also argue that any harm considered by the district court was speculative, and thus, not sufficiently concrete to warrant entry of a preliminary injunction. Again, we disagree.

First, the cases the Robertsons cite from the district courts in this Circuit do not compel the conclusion the Robertsons propound. In *Salsbury Lab., Inc. v. Merieux Lab., Inc.,* 735 F.Supp. 1537 (M.D.Ga.1987), for example, a former lab employee allegedly improved upon the plaintiff lab's vaccine formula, which was a trade secret. The plaintiff lab sought to enjoin the defendant lab from continuing to use the improved vaccine, alleging that it would suffer lost profits and damage to its reputation. The district court found that these contentions did not state irreparable harm. The instant case is substantially different. Whereas the plaintiff in *Salsbury* stood to suffer injury as a result of competition from another lab that allegedly misappropriated trade secrets, an injury that could be compensated fully by looking to the defendant lab's profits, McDonald's faces damage to its own reputation and loss of customers caused by the Robertsons' distribution of an allegedly inferior (and possibly dangerous) product held out to be McDonald's. Customers would believe that they were eating McDonald's sanctioned products when they consumed improperly cooked and unsanitarily maintained food products from the Robertsons' store. We can conceive of no realistic way to determine the damages under these circumstances.

Moreover, trademark actions "are common venues for the issuance of preliminary injunctions," *Foxworthy v. Custom Tees, Inc.,* 879 F.Supp. 1200, 1219 (N.D.Ga.1995) (citation omitted), and this Circuit has held that "a sufficiently strong showing of likelihood of confusion

[caused by trademark infringement] may by itself constitute a showing of ... [a] substantial threat of irreparable harm."[6] *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports,* 756 F.2d 1525, 1530 (11th Cir.1985); *see also Power Test Petroleum Distributors v. Calcu Gas,* 754 F.2d 91, 95 (2d Cir.1985) (Irreparable harm exists in a trademark case when the moving party "shows that it will lose control over the reputation of its trademark pending trial."); *Foxworthy,* 879 F.Supp. at 1219 ("When a plaintiff makes a *prima facie* showing of trademark infringement, irreparable harm is ordinarily presumed.") (citation omitted). Obviously, in this case, such a substantial likelihood of confusion—indeed, a certainty of confusion—of the Robertsons' substandard products with McDonald's certified products exists. Consequently, the district court correctly concluded that McDonald's made a sufficient showing of irreparable injury to justify entry of the preliminary injunction.

Finally, the Robertsons' citation of a laundry list of cases purportedly supporting their contention that McDonald's claimed harm was speculative and thus insufficient to constitute irreparable injury, is inapposite. For example, the Robertsons cite *Church v. City of Huntsville,* 30 F.3d 1332, 1337 (11th Cir.1994), for the proposition that "a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Church* involved a challenge by Huntsville's homeless population to certain alleged policies of the city resulting in the arrest and harassment of homeless individuals merely because they were homeless. The Court considered the question of

---

[6]Indeed, in a different section of their brief, the Robertsons concede "that once the District Court concluded that McDONALD'S had proven that it was reasonably likely to succeed on its trademark infringement claim, the District Court should have presumed that irreparable injury existed." Appellants' Initial Br. at 36 n. 6.

18

whether homeless individuals who had not been arrested or harassed had standing to challenge the

alleged policy. In that context, the Court made the statement quoted above. Quite simply, *Church*

is not relevant here. There has never been any doubt that McDonald's has standing to file suit

against the Robertsons and to seek a preliminary injunction against them. In short, we find that the

district court did not abuse its discretion in entering the preliminary injunction against the

Robertsons.

B.

Nor do we find that the district court's decision not to conduct an evidentiary hearing on the

motion for preliminary injunction warrants reversal.[7] As we noted previously, the district court

---

[7]McDonald's contends that this Court lacks jurisdiction to review the district court's denial of the Robertsons' request for an evidentiary hearing. Specifically, they argue that the October 14 order denying the evidentiary hearing on the preliminary injunction motion is not a final order, and, as an order issued separately from the order entering the preliminary injunction, is distinct from the preliminary injunction and not reviewable as a part thereof. We find no merit to this argument. First, there can be no doubt that the Court has jurisdiction over the appeal of the order entering the preliminary injunction. Indeed, even McDonald's concedes that 28 U.S.C. § 1292(a)(1) authorizes such an appeal. Appellee's Br. at ix. Second, the order granting the preliminary injunction is obviously inextricably intertwined with the order denying an evidentiary hearing on the preliminary injunction. We cannot fully address the question of whether the district court erred in granting the preliminary injunction without considering whether the district court was bound to conduct an evidentiary hearing. That the district court delivered its rulings in two different documents does not, as McDonald's suggests, necessarily render the orders unrelated. Indeed, it is difficult to conceive of what other period would constitute the appropriate time to appeal the order denying the evidentiary hearing on the preliminary injunction if not during the appeal of the order granting the preliminary injunction. Nor does *Gould v. Control Laser Corp.,* 650 F.2d 617 (5th Cir. Unit B 1981), the case McDonald's cites in support of the proposition that the Court does not have jurisdiction over the October 14 order, prevent the Court from exercising jurisdiction over the denial of the evidentiary hearing. Specifically, McDonald's cites to footnote 7 of that case, which states, in relevant part, "A litigant's right to appeal interlocutory injunctions only goes to the injunction itself, and he cannot force consideration of the merits of the underlying case except as necessary to review the injunction.... It is true that in reviewing interlocutory injunctions we may look to otherwise nonappealable aspects of the order, ... but we cannot examine the merits of the summary judgments at this time...." Plainly, this footnote does not bar the Court from

entered the challenged preliminary injunction without first holding an evidentiary hearing. Rather, the district court considered the written materials submitted and conducted oral argument on the motion. Citing Rule 65(a), Fed.R.Civ.P., the Robertsons appeal the district court's decision not to conduct an evidentiary hearing. Specifically, they contend that the district court was required to hold an evidentiary hearing for two independent reasons: (1) "conflicting material record evidence exist[ed]," and (2) the district court allegedly determined that a presumption of irreparable harm existed, thus necessitating an evidentiary hearing.

In making their argument, the Robertsons first note that Rule 65(a)(1), Fed.R.Civ.P., provides, in relevant part, "No preliminary injunction shall be issued without notice to the adverse party." They then cite to a footnote in *Granny Goose Foods, Inc. v. Brotherhood of Teamsters,* 415 U.S. 423, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974), for the proposition that "[t]he notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." Appellants' Initial Br. at 29 (citing *Granny Goose,* 415 U.S. at 432 n. 7, 94 S.Ct. 1113). Finally, they argue that "a fair opportunity to oppose the application" necessitates an evidentiary hearing, as opposed to the type of "hearing" the district court held in the instant case. *Id.* at 29.

considering the denial of the evidentiary hearing along with its review of the entry of the preliminary injunction. Indeed, the language of the footnote itself supports the proposition that the ruling on the evidentiary hearing may be considered along with the entry of preliminary injunction. Moreover, this Court has plainly stated, "[T]he scope of the court's jurisdiction [on appeal of a preliminary injunction] is limited to matters directly related to the [grant] of injunctive relief." *Kaimowitz v. Orlando,* 122 F.3d 41, 43 (11th Cir.), *amended,* 131 F.3d 950 (11th Cir.), *cert. denied,* --- U.S. ----, 118 S.Ct. 1842, 140 L.Ed.2d 1092 (1998). For the reasons already noted, denial of the motion for evidentiary hearing on the motion for preliminary injunction is "directly related to the [grant] of injunctive relief." *Id.* Consequently, we reject McDonald's jurisdictional argument and proceed to the merits of the Robertsons' claim that they were entitled to an evidentiary hearing.

Several problems with the Robertsons' argument exist. First, *Granny Goose* does not stand for the proposition that all opponents of preliminary injunctions are entitled to evidentiary hearings. Rather, as stated above, the purpose of Rule 65's notice requirement is to provide the party opposing the preliminary injunction with a "fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose,* 415 U.S. at 432 n. 7, 94 S.Ct. 1113. So long as these goals are met, Rule 65 does not require an evidentiary hearing. Indeed, if the Robertsons were correct, no preliminary injunction could ever issue without an evidentiary hearing. This is plainly wrong. *See All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.,* 887 F.2d 1535, 1538 (11th Cir.1989) ("An evidentiary hearing is not always required before issuance of a preliminary injunction.").

We consider, therefore, the circumstances under which an evidentiary hearing under Rule 65 is necessary. Previously, we have stated, "Where the injunction turns on the resolution of bitterly disputed facts, ... an evidentiary hearing is normally required to decide credibility issues." *All Care Nursing Service,* 887 F.2d at 1538 (citing *Forts v. Ward,* 566 F.2d 849, 851 (2d Cir.1977)). In *All Care Nursing Service,* the plaintiffs, several temporary nursing agencies, filed suit against the defendant hospitals and other health care providers. The parties agreed that a nationwide shortage of nurses existed at the time. Thus, the defendants decided to develop a program under which certain of the temporary service agencies would be designated "preferred agencies." Each participating hospital agreed to give first consideration to the preferred agencies in the staffing of temporary nurses. Among other bases for determining which agencies would be "preferred," the defendant hospitals strongly considered price. Additionally, the agencies had to agree to rebate a percentage of their gross yearly income to the defendants and not to compete with the hospitals in

21

the hiring of nurses. The plaintiff nursing agencies sued for alleged violations of the Sherman Act and sought and received a preliminary injunction enjoining the defendants from establishing maximum price standards to which agencies must adhere, from substantially interfering with the management or manner in which the individual agencies employ their nurses, and from requiring them to contribute any portion of their income in order to be considered as providers of temporary nurses. Before entering the injunction, the district court provided the defendants with two days' notice of the hearing, in which only oral argument was permitted. Additionally, the district court permitted the parties to file written affidavits and submissions in support of their respective positions. We determined that the trial court abused its discretion in failing to hold an evidentiary hearing because the parties had submitted conflicting affidavits that "placed in serious dispute issues central to appellees' claims." *All Care Nursing Service,* 887 F.2d at 1539. Additionally, in recognition of the complexity of the facts and the number of parties before the court in *All Care Nursing Service,* we stated, "A two-day notice, coupled with thirty minutes for oral presentations can hardly be said to constitute a meaningful opportunity to oppose appellees' motion for preliminary injunction. The court thus determines that under the facts of this case appellants were deprived of a fair and meaningful opportunity to oppose appellees' motion." *Id.* at 1538.

Conversely, in *Kaimowitz v. Orlando,* 122 F.3d 41 (11th Cir.1997), *amended,* 131 F.3d 950 (11th Cir.1997), we held that the district court did not err in declining to hold an evidentiary hearing on the plaintiff's motion for preliminary injunction where the preliminary injunction sought bore no relationship whatsoever to the underlying action. Because this recital effectively exhausts this Court's jurisprudence on the question of when it is necessary to hold an evidentiary hearing on a motion for preliminary injunction, we have considered cases from other Circuits for additional

22

guidance. Based on review of these cases, certain principles are apparent. First, as noted in *All Care Nursing Service,* where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. *See All Care Nursing Service,* 887 F.2d 1535; *Forts v. Ward,* 566 F.2d 849, 851 (2d Cir.1977) (quoting *Dopp v. Franklin National Bank,* 461 F.2d 873, 879 (2d Cir.1972) (quoting *Sims v. Greene,* 161 F.2d 87, 88 (3d Cir.1947))) (" "Generally, of course, a judge should not resolve a factual dispute on affidavits or depositions, for then he is merely showing a preference for "one piece of paper to another." ' "); *Campbell Soup Co. v. Giles,* 47 F.3d 467, 470 (1st Cir.1995) (quoting *SEC v. Frank,* 388 F.2d 486, 491 (2d Cir.1968)) ("[W]hen the parties' competing versions of the pertinent factual events are in sharp dispute, such that the propriety of injunctive relief hinges on determinations of credibility, "the inappropriateness of proceeding on affidavits [alone] attains its maximum.' "); *Elliott v. Kiesewetter,* 98 F.3d 47, 53 (3d Cir.1996) (citing *Professional Plan Examiners of New Jersey, Inc. v. Lefante,* 750 F.2d 282, 288 (3d Cir.1984)) ("A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact unless the court first holds an evidentiary hearing."); *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir.1997) (citing *Medeco Security Locks, Inc. v. Swiderek,* 680 F.2d 37, 38 (7th Cir.1981)) ("If genuine issues of material fact are created by the response to a motion for a preliminary injunction, an evidentiary hearing is indeed required."). Second, where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing. *See Maryland Casualty Co. v. Realty Advisory Board on Labor Relations,* 107 F.3d 979, 984 (2d Cir.1997); *Elliott,* 98 F.3d at 53-54 (quoting *Bradley v. Pittsburgh Board of Ed.,* 910 F.2d 1172, 1175-76 (3d Cir.1990)) (" "[A] decision [to enter an order] may be based on affidavits and

23

other documentary evidence if the facts are undisputed and the relevant factual issues are resolved.' "); *Ty, Inc.,* 132 F.3d at 1171 ("[A]s in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive....").

Between these extremes falls the category of cases where " "there is little dispute as to raw facts but much as to the inferences to be drawn from them.' " *Jackson v. Fair,* 846 F.2d 811, 819 (1st Cir.1988) (quoting *Frank,* 388 F.2d at 490-91). Thus, the First Circuit has adopted an approach to determine whether an evidentiary hearing is necessary that "leave[s] the balancing between speed and practicality versus accuracy and fairness to the sound discretion of the district court." *Id.* In *Jackson,* the plaintiff, a prisoner who had been released from a mental hospital to corrections officials, filed a motion for a preliminary injunction requiring him to be sent back to the mental hospital in which he had previously been incarcerated. The court noted that the parties did not dispute the basic events; they agreed, for example, that the plaintiff had swallowed a bedspring after his transfer from the mental hospital to the corrections facility. They characterized the degree of the plaintiff's illness differently, however, and they disagreed over whether the corrections facility offered adequate care. The court found that although these questions were factual, they could best be answered by witnesses with medical expertise. Noting that the plaintiff had failed to identify at the preliminary injunction stage what evidence he planned to offer that might dispute the defendants' documentary evidence, the court held that the district court did not err in declining to hold an evidentiary hearing.

We find based on the record here that this case falls into the second category of cases identified above—that is, material facts are not in dispute, or the disputed facts are not material to

24

the preliminary injunction sought. In this case no real controversy exists over whether the Robertsons engaged in repeated QSC and food safety violations. Because these violations constituted a material breach of the franchise agreement sufficient to justify termination, we conclude that no evidentiary hearing was required in this matter. The Robertsons had ten days to provide affidavits and other evidence showing a material issue of fact regarding whether the Robertsons' restaurant actually had committed the infractions described by McDonald's. Thus, they had sufficient and fair notice. Rather than contending that they had not engaged in unsanitary QSC and food safety procedures, however, the Robertsons conceded the violations and argued that the termination was instead motivated by McDonald's desire to open a new restaurant down the block. Because any ulterior, improper motive McDonald's may have had to terminate the contract is irrelevant where a legitimate reason for doing so exists under the contract, the Robertsons' filing created no material issues of fact relating to the propriety of entering the injunction and was therefore insufficient to warrant an evidentiary hearing.

Additionally, the Robertsons contend that the district court presumed irreparable injury, so, under this Court's precedent, it was therefore required to conduct an evidentiary hearing. We note that the Robertsons did not raise this issue below. Consequently, their argument fails. *See Royals v. Tisch,* 864 F.2d 1565, 1568 n. 6 (11th Cir.1989).

Nevertheless, even if the Robertsons had timely raised this point, it would lack merit. First, the holding in *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167 (11th Cir.1988), the case on which the Robertsons principally rely in making this argument, is, by its own language, limited to the facts of that case. In *Baker,* the plaintiff, who alleged violations of Title VII against her employer, sought a preliminary injunction against her employer barring the employer from engaging in certain actions

25

the plaintiff viewed as retaliatory. Without a hearing of any type, the district court denied the preliminary injunction because it found that the plaintiff had failed to make a showing of irreparable injury. This Court reversed, finding that irreparable injury is presumed in Title VII cases in this Circuit. Although the Court made the general statement, "[W]here there is a presumption of irreparable harm, as in this case, the court should conduct an evidentiary hearing before granting or denying the motion," *id.* at 169, the opinion nonetheless evinces an intent to limit the holding to the facts of the case. Indeed, even after stating that irreparable harm is presumed in Title VII cases, the Court stated, "*On the facts of this case,* we hold that the district court erred in not conducting an evidentiary hearing to determine whether [the defendant] could overcome [the] presumption [of irreparable injury], or whether [the plaintiff] had met the other requirements...."[8] *Id.* at 169 (emphasis added).

*Baker* is also distinguishable from the case at hand. In *Baker,* the district court failed to enter a preliminary injunction, apparently based solely on the plaintiff's failure to prove irreparable harm. *Baker,* 856 F.2d at 170. In the instant case, however, the district court did not presume irreparable injury; rather, it actually found irreparable harm, noting, "There is no present dispute concerning the probability that consumers will confuse the Plaintiff's products with those presently served by

<hr/>

[8]The Robertsons also cite to *Kaimowitz v. Orlando,* 122 F.3d 41, *amended,* 131 F.3d 950 (11th Cir.1997). It likewise fails to support the Robertsons' contention that the district court was required to hold an evidentiary hearing where the district court had presumed irreparable injury. The Court recently amended the original opinion in *Kaimowitz* to delete the sentence on which the Robertsons rely. Specifically, the sentence in question previously read, "Generally, evidentiary hearings are required prior to the issuance or denial of a motion for preliminary injunction only where there is a presumption of irreparable harm, as in a Title VII employment discrimination case." The sole authority relied upon for this deleted statement was *Baker.* Consequently, we disagree with the Robertsons' contention that this Circuit has held that in all cases where irreparable harm is to be presumed, an evidentiary hearing must be held.

the Defendants—the parties are using identical trademarks. Where, as here, the likelihood of confusion is particularly strong, the loss of reputation, trade and goodwill potentially flowing from the continued infringement justifies a *finding of irreparable injury*." District Court Order at 10 (emphasis added). Thus, the district court was not required to hold an evidentiary hearing.

III.

We therefore conclude that the district court did not err in denying the Robertsons' motion for evidentiary hearing and in granting McDonald's motion for preliminary injunction. Accordingly, the judgment of the district court must be, and is, AFFIRMED.

CARNES, Circuit Judge, concurring specially:

I join all of the Court's well written and persuasive opinion in this case, except the part about whether a franchisor seeking to have a franchisee enjoined from continuing to use a trademark under a now terminated agreement must show that its termination of the agreement was proper. Resolution of that issue of first impression in this circuit is not necessary to the disposition of this appeal. As the Court holds, this franchisor has shown (or made a substantial showing, which is the applicable standard at this stage) that it was within its rights to terminate the agreement. Given that holding, it matters not at all to the disposition of this appeal whether a franchisor must show proper termination in order to be entitled to stop the franchisee's continuing use of a trademark, i.e., we need not decide what we might have done if the termination had been improper. Accordingly, all of the Court's comments about that issue are dicta. *See, e.g., United States v. Eggersdorf,* 126 F.3d 1318, 1322 n. 4 (11th Cir.1997); *United States v. Maza,* 983 F.2d 1004, 1008 n. 8 (11th Cir.1993).

Dicta has its place and serves some purposes. *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519, 1524, 1527, 1532—38 (11th Cir.1997) (using dicta in an attempt to clarify confusion

27

caused by dicta in another opinion, but leaving it up to the reader to decide if the attempt was successful), *cert. denied,* --- U.S. ----, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Somewhat like statements in a law review article written by a judge, or a judge's comments in a lecture, dicta can be used as a vehicle for offering to the bench and bar that judge's views on an issue, for whatever those views are worth. The persuasiveness of the rationale given can increase the weight accorded those views, but the fact that the views are formed and put forward in a context of a case in which they do not matter will always subtract from the weight given them.

It is the nature of judges, like most human beings, to be more cautious, deliberative, and judicious—characteristics that should be brought to bear in deciding important issues—when what they say makes a difference to someone before them. It is one thing to offer a view on an abstract or hypothetical question, to put forward a speculative comment, but quite another to decide an issue that will affect and allocate the competing interests of the parties in an actual case before the court. Deciding real issues presented by real parties in real time focuses judicial decision making in ways that making speculative pronouncements about hypothetical questions cannot.

Views expressed in dicta are less reliable than those embodied in holdings for another reason. Unlike judicial holdings, dicta does not carry with it the added assurance of having survived what for the judiciary amounts to a kind of peer review. Dicta in a panel decision may be subject to comment, criticism, or disapproval by another member of that same panel, but it is effectively insulated from en banc or Supreme Court review. No matter how strongly other members of the Court are convinced that a panel's dicta is wrong, any suggestion that the whole Court grant rehearing to correct it will be met, quite properly, with the response that it is only dicta, that the issue addressed is not actually presented, and so it would be an improper use of en banc resources to

28

examine and comment upon it. *See* Fed. R.App. P. 35(a) (en banc rehearing is not favored and should not be ordered except when necessary for uniformity of decisions or when a question of exceptional importance is involved). Much the same is true of review by the Supreme Court, which grants certiorari only to review lower court holdings that are essential to the judgment in a case. *See, e.g., Rogers v. United States,* --- U.S. ----, 118 S.Ct. 673, 677, 139 L.Ed.2d 686 (1998) (dismissing as improvidently granted a writ of certiorari because the issue upon which it was granted was not fairly presented by the record); *Ticor Title Ins. Co. v. Brown,* 511 U.S. 117, 121, 114 S.Ct. 1359, 1361-62, 128 L.Ed.2d 33 (1994) (dismissing writ as improvidently granted where "it is not clear that our resolution of the constitutional question will make any difference even to these litigants").

For these reasons, among others, dicta in our judicial opinions is not binding on anyone for any purpose. Because of considerations having to do with the first word in that court's name, Supreme Court dicta may be a different matter insofar as "inferior courts" such as our own and the district courts are concerned. *See, e.g., United States v. City of Hialeah,* 140 F.3d 968, 974 (11th Cir.1998); *Peterson v. BMI Refractories,* 124 F.3d 1386, 1392 (11th Cir.1997) ("Dicta from the Supreme Court is not something to be lightly cast aside."). But dicta in our opinions cannot establish either the law of the circuit, or even the law of the case. *See, e.g., United States v. Dayton,* 981 F.2d 1200, 1202 (11th Cir.1993); *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller,* 957 F.2d 1575, 1578 (11th Cir.1992).

As the Court's opinion in this case points out, the two district courts in this circuit that have addressed (in published opinions) the issue in question have reached opposite conclusions concerning it. That might tempt us to express our views on the subject in order to "provide guidance," but we cannot decide in this appeal which district court's view is the correct one. We can

29

decide nothing more than that which is necessary to decide this appeal. Moreover, that two district court judges have differed over the question establishes it is one which is sufficiently difficult to cause reasonable jurists to disagree, and that argues in favor of withholding our views until the issue is squarely presented in an appeal which depends upon resolution of the issue.

Whether to include in an opinion dicta on related but unnecessary issues is a matter soundly within the discretion of each judge, to be exercised on a case by case basis, and I intend no criticism of my two colleagues in this instance. Instead, I have written separately only to explain why I have chosen not to join their dicta.