ALLTEL CORPORATION, Plaintiff,

v.

ACTEL INTEGRATED COMMUNICATIONS, INC., Defendant.

No. CIV. A. 99–0195–CB–M.

United States District Court,
S.D. Alabama,
Southern Division.

March 15, 1999.

J. Alan Baty, Maynard, Cooper, and Gale P.C., Birmingham, AL, Patrick C. Cooper, Birmingham, for Plaintiff.

Frank J. Colucci, Colucci & Umans, New York City, Daniel J. Shapiro, Gordon, Arata, McCollam, Duplantis, & Eagin, L.L.P., Baton Rouge, LA, for Defendant.

## OPINION AND ORDER

BUTLER, Chief Judge.

This matter came before the Court on March 5, 1999, for a hearing on plaintiff's motion for preliminary injunction. Plaintiff Alltel Corporation seeks to enjoin defendant Actel Integrated Communications, Inc. from using the name "Actel" on the ground that use of the name amounts to trademark infringement, false designation and trademark dilution. After hearing the evidence presented by both sides, the Court finds that the motion is due to be denied for the reasons set forth below.

### I. Findings of Fact

Plaintiff Alltel Corporation is an Ohio corporation with its headquarters in Little Rock, Arkansas. Alltel is a fully converged telecommunications provider, meaning that it provides both local and long distance wireless service, internet access and paging services. These services are offered to both residential and business customers. Alltel, a publicly traded

corporation, operates in approximately twenty states. Its 1998 revenues were between six and seven billion dollars. Alltel Corporation registered the name "Alltel" as a trademark in 1983 and has used the name continuously since that time.[1]

In 1998 Alltel began constructing a telecommunications system to serve the Gulf Coast region of Alabama, Florida and Mississippi. Beginning in mid-February 1999, Alltel opened up retail outlets in the Gulf Coast area, hired outside sales staff to solicit business customers and began an extensive television, radio and newspaper campaign to advertise its services. Alltel's 1999 advertising budget for this region alone is approximately two-and-a-half million dollars. The thrust of Alltel's advertising is that it allows the consumer to combine multiple telecommunications services—wireless local and long distance, paging and internet access—on one bill. Alltel also sells cellular telephone equipment in its retail stores.

The defendant, Actel Integrated Communications, Inc. ("Actel"), was incorporated in the state of Alabama corporation in October 1998 and is the brainchild of its CEO, John Beck. Following the recent federal deregulation of local telephone service, Beck, a communications engineer, brought together a group of people with expertise in the communications industry to set up a company to compete with Bell-South in the Mobile and New Orleans metropolitan areas. In 1998, Murdock Communications ("Murdock") provided venture capital for Beck's then unnamed company and in exchange obtained majority ownership. Eventually those involved in the new company settled on the name "Actel" because Murdock, which owns a group of small, diverse telecommunications companies had majority ownership in a Texas data company known as Acnet. Because they assumed that all the Murdock companies will one day merge, it was logical to choose a similar name.[2] An attorney for Murdock performed a trademark search and then applied for registration of the name "Actel".

Actel has begun some marketing efforts but has not yet begun doing business. When it opens for business in the near future, Actel plans to offer only three types of services—local, long distance and bulk IP—which it will market only to small- and medium-sized businesses. All of Actel's services involve the use of wire transmission, as opposed to wireless, or cellular, transmission. "Bulk IP" is an internet service which does not flow directly to the individual internet consumer. Rather, as a bulk IP provider, Actel would provide the link to the internet used by the consumer's internet service provider, such as American on Line or the local Zebra Net. Actel does not plan any retail outlets but instead will market its services directly by sending its sales staff to call on potential customers.

Actel has expended a significant portion of its marketing budget advertising and marketing its services under the Actel logo.[3] Actel currently sponsors the "Actel Sports Cruiser" which bears the company's logo for a local sports radio station. Actel has also begun sponsoring the weather forecast on a New Orleans television station. The company has purchased thirty-nine billboards in the Mobile area which were scheduled to bear Actel advertising beginning February 22, 1999, but currently stand empty because of this litigation. In addition, the company has com-

---

1. In 1990 Alltel filed an affidavit with the United States Patent and Trademark Office establishing the incontestability of its trademark.

2. According to Beck, the phrase "Ac" was meant to invoke the word "active". Consequently, the word "active" has been used in branding products to be offered by Actel, such as "Active Link" and "Active Choice".

3. Actel's total 1999 advertising and marketing budget for Mobile and New Orleans is $860,000. Of this, $375,000 is reserved for the Mobile market.

mitted to sponsor the Mobile Baybears baseball team for the 1999 season.

According to Beck, Actel currently has approximately 150 customers lined up in Mobile and approximately the same number in New Orleans. Actel has not signed these customers to contracts, however, out of concern for repercussions from a potential name change. Beck testified that his company fears charges of "slamming" if the company changes its name after signing customers.[4]

As a start-up company, Actel has only a limited amount of capital. It has already expended a significant amount of money on the use of the Actel logo in marketing and advertising. Most of this money will have been wasted if the company is prohibited from using the name Actel. At the least, several months of work will be required to get the company back to its current position. At worst, there is a real possibility that the company will be forced out of business as a result of the costs associated with a name change.

From the evidence presented at the hearing, the Court is not persuaded that Alltel and Actel will directly compete with each other in any serious manner during the next few months. There is currently little overlap between services offered by Alltel and those offered by Actel in this region. As discussed above, Actel offers only three services—local wire line service, long distance wire line service and bulk IP. Of those three services, Alltel currently offers only long distance wire line service.[5] The thrust of Actel's business is what is referred to as "POTS", or plain old telephone service. In contrast, Alltel's focus is geared toward information age technology—wireless telephone service, paging,

and internet access. Alltel's marketing appears directed at retail sales, although it does have an outside sales force, while Actel plans only direct sales to businesses.

At the hearing, Alltel offered evidence of several incidents which it contends illustrates actual consumer confusion between Alltel and Actel. First, through its vice-president, Harry Bruns, and its retail sales manager, Page Howell, Alltel presented evidence that it had received "dozens" of communications, including telephone calls and misdirected mail, intended for Actel. These incidents were reported to Bruns and Howell by other employees. Neither Bruns nor Howell had actually received any of these calls or the mail, and they had no explanation as to why they Actel's calls and mail were directed to Alltel.

Ms. Howell also testified to an incident that occurred at a Chamber of Commerce function when a man approached her with an Actel business card. The man held the card up and said "Actel, Alltel. They sound kind of similar." The man told Howell that his son-in-law worked for Actel. At that same meeting, Howell had a conversation with an Actel employee about whether or not the two companies would be offering the same services, i.e., wireline, or dial tone, service.

Howell also testified that she encountered some confusion about the two companies when she went to a local office equipment supply company, OEC. One of the OEC employees told Howell she was upset with Howell's boss because he would not return her telephone call. It turned out that the OEC employee was trying to sell office furniture to Actel, rather than Alltel, and that it was someone at Actel who had failed to call her back. According

---

**4.** "Slamming" is when a consumer's long distance service is changed from one company to another without the consumer's knowledge and approval.

**5.** Alltel's regional vice-president, Harry Bruns, testified that Alltel plans to offer local exchange service in the future. Bruns also testified that Alltel currently offers internet access, although it is not at all clear that this service directly competes with Actel's Bulk IP

service. Offering internet access could mean at least two things. It could mean that Alltel is an internet service provider, linking individual consumers to the internet access provider. Alternatively, it could mean that Alltel itself is the internet access provider. Alltel would compete with Actel in the latter situation but not in the former. Perhaps there are possibilities for providing internet access as well.

to Howell, OEC was one of her customers when she worked for other telecommunications companies, and she considers it to be a potential Alltel customer.

Finally, Ms. Howell testified that someone she knew called her to find out if Alltel was hiring. This person had seen an advertisement for Actel and called Howell believing that is was Alltel that was advertising for employees.

Another Alltel employee, Andrew Carl, testified that an a Chamber of Commerce meeting he spoke with Cindy McCrory, the business development manager of AM-STAFF Human Resources. When the two exchanged business cards, McCrory said, "I'm sorry. I thought you were Actel." She inquired whether Alltel was in the cellular business and told Carl that Actel was, too.

Martha Gallahue, Alltel's marketing specialist, testified that she received a call from her former employer, a marketing firm, inquiring whether she worked for Actel or Alltel. The inquiry had something to do with competition among marketing firms for Actel's business. Gallahue also testified that a representative from a Chamber of Commerce publication called to say that another marketing firm had reserved advertising space for Alltel. Since the firm did not represent Alltel, Gallahue informed the woman that she was mistaken. Though the Chamber representative apparently did not say so directly, Gallahue believed that the space had been reserved for Actel.

Several employees at Alltel's retail stores also testified about customer confusion. One testified that a customer came in and said he had previously had service with Actel and wanted it again. She told him they were Alltel and gave him the information. Another Alltel employee testified that he heard "Actel Sports Cruiser" advertisements on the radio and that when he told his friends he was going to work for Alltel, they would say "Actel". This employee also testified that a woman came into the store and asked for a person by name. When he informed her that no one by that name worked there, she looked around and said, "I'm sorry. I am supposed to be at a meeting at Actel." Finally, a retail sales representative testified that when she was at a local tanning salon, an Actel employee came in, saw an Alltel advertisement and remarked that he should rip it down because the company was going to be Actel's competitor.

Alltel also offered expert evidence to support its assertion that there is consumer confusion between the two companies. Dr. Robert Robicheaux, a professor of marketing, testified to the results of his focus group and a survey research conducted on the issue. On Monday, March 1, 1999, Robicheaux had Marketry, a marketing research firm in Birmingham, Alabama, assemble a group of seven people to discuss their views and opinions about the similarity of the names Alltel and Actel. According to Dr. Robicheaux's own testimony, a focus group does not yield statistically reliable information. Instead, the purpose of focus group research is to gain more in-depth understanding of the reasons behind consumer's opinions.

On March 2 and 3, 1999, Marketry conducted a random sample telephone survey of fifty households in the Mobile area. Although Dr. Robicheaux's conclusion from the survey was that there was confusion between the two companies, there were a number of obvious problems with that survey. First, the sample was very small, and the resulting margin of error was large—plus or minus 14%. Second, a disproportionate number (14 out of 50) of persons over the age of 65 were surveyed. Third, the question wording seems, to the Court, likely to elicit positive responses to confusion.[6] Finally, even Dr. Robicheaux himself ultimately admitted that the survey was one of "limited reliability."

---

6. For instance, respondents were given the names "Alltel" and "Actel" and asked whether they strongly agreed, agreed, disagreed or strongly disagreed with the following statements: "The names sound too much alike." "It would be easy to confuse names sounding ..." "Competing companies should not have names that sound too much alike."

## II. Conclusions of Law

The Eleventh Circuit has noted that a "preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant *clearly* carries his burden of persuasion as to the four prerequisites." *Northeastern Florida Chapter of the Assoc. of General Contractors v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990) (emphasis added) (internal citations and quotations omitted). Those prerequisites are: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) [movant's] own injury outweighs the injury to the nonmovant; and (4) the injunction would not disserve the public interest." *Haitian Refugee Ctr., Inc. v. Baker,* 949 F.2d 1109, 1110 (11th Cir.1991). However, the movant's failure to satisfy any of the four prerequisites precludes relief. *Northeastern Florida Chapter,* 896 F.2d at 1285. In this case, the Court is not persuaded that Alltel has proven any of the four prerequisites.

### A. Likelihood of Success on the Merits

Alltel has asserted three claims against Actel—service mark infringement in violation of 15 U.S.C. § 1114, false designation of origin in violation of 15 U.S.C. § 1125(a) and service mark dilution in violation of 15 U.S.C. § 1125(c). The Court is not persuaded that Alltel has a substantial likelihood of success on the merits of any of these claims.

### 1. Service Mark Infringement

Plaintiff's primary claim is that the defendant's use of the name "Actel" infringes upon its registered mark "Alltel". To prove a claim for infringement, plaintiff must establish "first, that its mark is valid and, second, that the defendant's use of the contested mark is likely to cause confusion." *Dieter v. B & H Indus. of Southwest Florida, Inc.,* 880 F.2d 322, 326 (11th

Cir.1989). There is no question that Alltel meets the first prong of its infringement claim. Once a mark has been registered for five years and declared incontestable with the United States Patent and Trademark Office, "its validity is conclusively presumed." *Dieter,* 880 F.2d at 326 & 328. Actel does not contest the validity of Alltel's mark.

The crux of this case is whether there is a likelihood of confusion. The question is whether the defendant's mark " 'is likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods' " *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 933 (4th Cir.1995) (quoting *Anheuser-Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.1992)). The Eleventh Circuit has identified seven factors to consider in determining whether a likelihood of confusion exists: (1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion. *Dieter,* 880 F.2d at 326. "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit." *Id.*

In *Dieter* the Eleventh Circuit held that "the incontestable status of a mark is a factor to be taken into consideration in likelihood of confusion analysis" and that an incontestable mark is "presumed to be . . . a relatively strong mark." *Id.* at 329. Because of this presumption, Alltel argues that no evidence offered by Actel regarding the strength of the mark should be taken into consideration. However, presumptions generally can be rebutted or overcome. In fact, in *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620 (6th Cir.1998), the only other circuit to adopt the presumption that a valid mark is presumed to be strong,[7] held that trial

---

7. Such a presumption has been rejected by most circuits, *see, e.g., Lone Star Steakhouse,* 43 F.3d at 934 (collecting cases) and criticized by commentators. *See* 4A Callman, *Unfair Competition, Trademarks and Monopolies* § 25.08 (4th ed.1983); 1 Gilson, *Trademark Protection and Practice* § 2.01 (1994).

court erred in failing to consider evidence of third party usage of the mark and "whether [defendant's evidence] overcame the presumption that [plaintiff's mark] was a strong mark." *Id.* at 625.

Actel has presented evidence that a number of companies use names similar to Alltel. At least ten companies use similar marks—Actel Corp. (not the defendant), Accutel, Airtel, Alcatel, Antel (2 users), Arctel, Autel, Axtell and Pactel. In the Court's opinion, the existence of this many companies with similar names undermines Alltel's presumption of a strong mark.[8] At most, the Court finds that this factor, *i.e.,* the type of mark, is neutral.

The next factor—similarity of the marks—favors Actel. Similarity is determined by considering the overall impression created by the marks. *Jellibeans, Inc. v. Skating Clubs of Georgia,* 716 F.2d 833, 842 (11th Cir.1983). "This consideration includes a comparison of the appearance, sound and meaning of the marks as well as the manner in which the marks are used." *Ross Bicycles, Inc. v. Cycles USA, Inc.,* 765 F.2d 1502, 1507 (11th Cir.1985). Use of an identical word is not dispositive, especially if the word would naturally be used in association with a particular product. *Freedom Savings & Loan Ass'n v. Way,* 757 F.2d 1176 (11th Cir.1985).

Alltel and Actel do share some obvious similarities, but those similarities are not sufficient to cause any likelihood of confusion. Both begin with the letter "a", both have two syllables and the second syllable "tel" is the same in both. However, the suffix "tel" is one commonly associated with the telecommunications industry, so that similarity is of minimal importance. The first syllables of each word—"ac" and "all"—do not sound alike. Further, the

overall effect of the two words is quite different. The term "all" invokes images of precisely what Alltel does—providing all-encompassing telecommunications services on one bill. The term "ac" was meant to, and does, invoke the image of "active", *i.e.,* an active telecommunications company. Finally, the company logos are distinct. Alltel uses all capital letters while Actel uses all lowercase letters.

Actel concedes that the similarity of the parties' services is a factor that favors Alltel. While Alltel's services are far broader than Actel's, Alltel currently offers wireline local and long distance services in other areas and plans to do so, if it does not already, in Mobile.[9]

The next factor—similarity of customers and facilities—favors Actel. Unlike Alltel, which advertises heavily to the retail market, Actel has no retail outlets. Therefore, customers will not walk into an Actel store when they mean to be going to Alltel. Actel plans to sell its product directly to small– to medium–sized businesses. Alltel also has an outside sales force through which it intends to solicit business customers. Although the two share this customer base, businesses are more discerning than the average consumer and should be able to make an informed choice between the two. This is especially true when the product will be identified with a sales person who calls on the business, rather than the logo or advertisement of a retail store.

There is some similarity in the advertising methods used by the two. Both use radio and television advertisements. However, Actel's only television advertisement is the sponsorship of a weather report on a New Orleans station. Its only radio advertisement is sponsorship of the local sports radio station's "Actel Sports Cruiser". In contrast, Alltel has engaged in

---

**8.** Alltel argues that this evidence is not probative because the companies, with one exception, are in different classifications, apparently meaning that they not operate in the same industry. However, the court's discussion in *Data Concepts* implies that this is immaterial. *Data Concepts,* 150 F.3d at 625 n. 2 (discuss-

ing numerous diverse internet cites using same mark as plaintiff's).

**9.** It was not entirely clear from the testimony at the hearing whether the same type of internet access service is offered by the two companies.

extensive television, newspaper and radio advertisements in the Mobile market, and Alltel's advertising budget for the Mobile area is almost ten times greater than Actel's. The Court finds that this factor favors Actel.

The defendant's intent is another factor relevant to the issue of confusion. There is no evidence that Actel chose its name in an attempt to capitalize on Alltel's mark. *See Ross Bicycles*, 765 F.2d at 1508 (deliberate intent to capitalize on another's name is important consideration). Here, Actel's name was derived from the name of another company within the Murdock family. The company conducted a search and registered the name. These facts indicate that there was no malicious intent on the part of Actel. *Id.* (trademark search is evidence of good faith). Consequently, the defendant's intent weighs in Actel's favor.

█ The final issue is whether there has been actual confusion among potential customers. In examining this issue, the Court should consider "the time period in question and how extensively the product is advertised or made known to the public, as well as the type of confusion that exists and who suffers the confusion." *Jellibeans*, 716 F.2d at 844. Survey research may be probative evidence of actual confusion. *Id.* at 843–45. When it comes to actual confusion the ultimate question is whether the evidence demonstrates that an ordinary customer was confused about the source or sponsorship of the goods or services. *Cf. Lone Star Steakhouse*, 43 F.3d at 933. Taking all of these factors into consideration, Alltel's evidence does not demonstrate that any ordinary consumer of the services offered by the two companies was actually confused about which company supplied those services.

Alltel's evidence that it received telephone calls and mail meant for Actel is not probative for two reasons. First, most of it is rank hearsay. Neither Bruns nor Howell actually received any of the calls or saw the mail. Second, there is no evidence as to how these calls and letter were misdi-

rected. These mistakes could easily have been the result of carelessness on the part of directory assistance or the post office.

Several of the encounters testified about amounted to nothing more than comments or inquiries about the company. The man who approached Howell at the Chamber of Commerce obviously knew the difference between the two companies because his son-in-law worked for Actel, and he commented only that the names "sounded kind of similar." Cindy McCrory, the AMSTAFF manager who spoke to Carl at the Chamber of Commerce meeting, said only that she though he was Actel. She did not indicate that she did not know the difference between the two. Similarly, Ms. Howell's experience at OEC does not indicate that the woman at OEC did not know the difference between Actel and Alltel or their services. She just did not know which of the two Howell worked for. Likewise, other incidents testified about—such as the Chamber of Commerce mistake about reserving advertising space for Alltel and a person walking into Alltel when she had an appointment at Actel—do not demonstrate that the person did not know the difference between the two companies and their services.

In discounting the probative value of the confusion evidence plaintiff has proffered, it is important to consider that there has been virtually no opportunity for product identity to have developed among consumers. Of the two companies, only Alltel has actually opened for business in this area. Neither company had begun to develop a business in Mobile until October 1998, less than six months ago.[10] Actel has had very limited advertising, and Alltel did not begin its advertising until about February 22, 1998, the date it opened its retail stores in Mobile. Most of the confusion testimony relates to incidents that took place before there was any advertising or any Alltel retail outlet in Mobile. Consequently, the vast majority of people in Mobile likely know nothing about either Alltel or Actel

10. Actel actually was in existence before then but did not adopt its name until late October.

or the products or services offered by either company. Logically, one would have to know something about one company's services to confuse them with those of another company.

Although survey evidence is considered relevant in determining whether there is a likelihood of confusion, the survey proffered by the plaintiff in this case was of little evidentiary value. The results simply were not reliable. The sample was too small, the margin of error too large and the sample not representative of the population surveyed. Furthermore, the survey universe was not limited to the likely users of the common services to be offered by both companies, *i.e.*, business people. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.1980) (discounting evidentiary value of survey because survey universe was not limited to likely users of the product).

In sum, of the seven factors to be considered, only one—similarity of services—actually weighs in favor of Alltel. The remaining factors either favor Actel or are neutral. Consequently, Alltel has failed to persuade the Court that there is a the likelihood of confusion between the two companies.

### 2. False Designation

Likelihood of confusion is also a key element of plaintiff's claim for false designation of origin under 15 U.S.C. § 1125(a). *See Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975). Therefore, plaintiff's failure to prove a likelihood of confusion is also fatal to its false designation claim.

### 3. Service Mark Dilution

" 'Dilution' is defined as 'the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion mistake or deception.' " *Panavision Internat'l, L.P. v. Toeppen,*

141 F.3d 1316, 1326 (9th Cir.1998) (quoting 15 U.S.C. § 1127). To succeed on its claim for service mark dilution under 15 U.S.C. § 1125(c), plaintiff must prove that its service is famous within the meaning of the statute. The following factors are relevant in determining whether a mark is famous and, therefore, deserving of protection from dilution: (i) the degree of inherent or acquired distinctiveness; (ii) the duration and extent of use of the mark; (iii) the duration and extent of advertising and publicity; (iv) the geographical extent of the area in which the mark is used; (v) the channels of trade in which the mark is used; (vi) the degree of recognition of the mark in the areas and channels of trade used by the owner and the entity allegedly diluting the mark; and (vii) the nature and extent of use of the same or similar marks by third parties; and (viii) whether the mark is registered on the principal register. 15 U.S.C. § 1125(c)(1).

"Few marks are ever famous [and] the short life of a plaintiff's mark makes it highly unlikely that the mark has become ingrained in the collective mind of consumers..." *Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 15 F.Supp.2d 389, 400 (S.D.N.Y.1998). Alltel's superficial discussion of the factors set forth above, underscores the *Lane* court's observation. Basically, Alltel contends that its mark is famous because it is strong and distinctive and Alltel has engaged in substantial advertising. However, there is no evidence regarding the mark's distinctiveness, the duration and extent of the use of the mark, the geographical area in which the mark is used, or the degree of recognition of the mark. Based on the evidence presented, the Court cannot conclude that the mark is famous. Consequently, plaintiff has failed to establish a substantial likelihood of success on the dilution claim.

### B. Irreparable Injury

Alltel contends that it has proven irreparable injury by proving a substantial likeli-

hood of confusion. *See McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1310 (11th Cir.1998) (sufficiently strong showing of likelihood of confusion constitutes proof of irreparable injury). Because the Court has not found a likelihood of confusion, Alltel's proof of irreparable injury also falls short.

### C. Balance of Harms

■ The balance of harms very clearly weighs in favor of the defendant, Actel. Although Actel is a new company, it already has a considerable investment in its name. It has spent a substantial amount of its limited resources on advertising, marketing and start-up costs using the name "Actel". Actel has a sales force ready to sell, billboards waiting for advertisements and customers waiting to sign contracts. If the company is prevented from using the name, then several months work will be lost. Start up will be delayed as the company goes through the naming process once again,[11] then reworks its logo and advertising. Customers cannot be signed until the company has a name. Advertising dollars, many of which are already committed, will be wasted until a new name has been approved. Most importantly, as a start-up company it is highly possible that the costs associated with these unplanned expenditures will force the company out of business before it ever has a chance to get off the ground.

In contrast, Alltel's injury is loss of reputation, trade and goodwill which arises from the likelihood of confusion of the products.[12] *McDonald's,* 147 F.3d at 1314. Although such injury cannot be quantified, the threat is minimal in this case, given the current lack of overlap in competition between Alltel and Actel. At worst, Alltel will suffer injury from confusion with Actel in only one small segment of its current market—providing wireline long distance to businesses in the Mobile area. Furthermore, Alltel is a large, well-financed corporation that operates in many markets. Consequently, any damage that may result from customer confusion in the Mobile market during the course of these proceedings will not have a significant impact on the company.

### D. Public Interest

■ In addition to the greater harm that would befall Actel, the public interest would not be served by a preliminary injunction. While some courts have defined the public interest in a trademark case as the public's right not to be deceived or confused, *e.g., Pappan Enterprises v. Hardee's Food Systems, Inc.,* 143 F.3d 800, 807 (3d Cir.1998), others have recognized a countervailing public interest in free competition, low prices and avoiding monopolies. *E.g., August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616, 619 (7th Cir.1995); *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.,* 815 F.2d 500, 505 (8th Cir. 1987). Here, plaintiff has offered nothing that would persuade the Court that the former outweighs the latter. Whether Actel competes directly with Alltel or with other companies, the effect of a preliminary injunction would be to prevent competition. An injunction would keep Actel completely out of competition for a number of months, if not altogether. To prevent a small company from competing on the chance that some consumers in a small segment of the market might confuse it with a much larger potential competitor serves no public interest.

### Conclusion

For the reasons set forth above, the Court finds that the plaintiff has failed to meet its burden of proving each of the prerequisites necessary to obtain prelimi-

---

**11.** The testimony at the hearing established that naming a company is not a simple process but a rather complicated one involving trademark searches and registrations applications. It involves more than simply coming up with a new logo and painting it on the sports cruiser.

**12.** The Court assumes for the purposes of argument that there is likelihood of confusion but makes no finding as to this issue.

nary injunctive relief. Accordingly, it is **ORDERED** that the motion for a preliminary injunction be and hereby is **DENIED**.