**DUNKIN' DONUTS INCORPORATED,**
**a Delaware Corporation, Plaintiff,**

**v.**

**ALBIREH DONUTS, INC., a New York**
**Corporation, Fawzi Mustafa and**
**Diya Mustafah, Defendants.**

**No. 00–CV–0517.**

United States District Court,
N.D. New York.

April 28, 2000.

---

Robert L. Zisk, David E. Worthen, Annemarie Brennan, Schmeltzer, Aptaker & Shepard, P.C., Washington, D.C., Joshua A. Sabo, Donohue, Sabo, Varley & Armstrong, P.C., Albany, NY, for Plaintiff.

---

## MEMORANDUM—DECISION & ORDER

McAVOY, District Judge.

Plaintiff Dunkin' Donuts, Incorporated ("DDI") commenced the instant action against Defendants alleging breach of contract and violations of sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125, arising out of Defendants' alleged failures to comply with the health and safety requirements of a franchise agreement. Presently before the Court is DDI's motion pursuant to FED. R. CIV. P. 65 seeking a preliminary injunction enjoining Defendants from continuing to violate such health and safety standards.

## I. PROCEDURAL HISTORY

On April 3, 2000, DDI commenced the instant action against Defendants asserting claims for breach of contract, trademark infringement, unfair competition, and trademark dilution. The Complaint does not seek compensatory damages; rather, it seeks injunctive relief and an award of attorneys' fees and costs. On that same day, DDI also filed a motion for a preliminary injunction seeking to enjoin Defendants from violating DDI's standards for health, sanitation, and safety. On April 4, 2000, DDI personally served a copy of the Complaint and motion papers on Defendants. To date, no Answer has been filed with the Court. Similarly, Defendants have failed to respond to DDI's motion and the time for doing so has now expired.[1] See N.D.N.Y.L.R. §§ 7.1(b)(2); 7.1(b)(1)(E)(15).

## II. BACKGROUND

DDI is engaged in the business of franchising independent business persons to operate Dunkin' Donuts shops. The franchisees are licensed to use Dunkin' Donuts' trade names, service marks, and trademarks, and operate under the Dunkin' Donuts system of producing, merchandising, and selling various food products. Defendants Albireh Donuts, Inc., Fawzi Mustafa, and Diya Mustafa, are the franchisees of a Dunkin' Donuts retail donut shop and licensees of Dunkin' Donuts' trademarks, trade names, and trade dress.

Pursuant to the franchise agreement, DDI agreed to provide "operating manuals ... which contain the standards, specifications, procedures, and techniques of the Dunkin' Donuts System," and to "continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all Dunkin' Donuts shops, thus protecting and enhancing the reputation of Dunkin' Donuts." See Franchise Agreement, at § 3. In exchange, the Defendants agreed that: "every detail of

---

1. Pursuant to Local Rule 7.1(b)(2), the return date is the next motion day that is at least twenty-eight days after the initial filing and service of the motion. Thus, the initial moving papers are filed and served at least 28 days before the return date. Opposition papers must be filed and served at least fourteen days prior to the return date.

Here, the motion papers were filed with the Court on April 3, 2000 and served on Defendant on April 4, 2000. Accordingly, the return date was set for May 8, 2000, which was the next available return date that was at least twenty-eight days after the initial filing and service thereof. Opposition papers were due on or before April 24, 2000, fourteen days before May 8, 2000. To date, Defendants have failed to appear in this action.

the Dunkin' Donuts System is important to Dunkin' Donuts ... in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities, products and techniques... to protect and enhance the reputation and goodwill of Dunkin' Donuts." *See* Franchise Agreement, at § 5. Defendants further agreed to "maintain ... at all times, the interior and exterior of the [store] and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by Dunkin' Donuts." *Id.* Pursuant to section 6 of the franchise agreement, DDI retained the right at all times,

> to enter and inspect the [shop] and the right to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, signs and equipment for evaluation purposes to assure that these times conform to the standards and specification of the Dunkin' Donuts System ... [i]n order to preserve the validity and integrity of the proprietary marks and to assure that the standards and specifications of the Dunkin' Donuts System are properly employed in the operation of the [shop].

In accordance with the franchise agreement, DDI provided Defendants with various operating manuals governing the specifications and health and safety requirements expected of its franchisees. *See* Laudermilk Certification at Exs. D, E, F, and G. These guidelines cover such topics as how to properly thaw food, the time frames within which to use various food products, the proper operating temperatures of refrigerators and freezers, how to properly receive and store raw materials, the temperatures at which various food products must be stored, how to properly clean, sanitize, and maintain equipment, etc. *See id.*

On February 16, 2000, an inspector acting on behalf of DDI inspected Defendant's store and recorded numerous health, safety, and sanitation violations.

*See* Wright Certification, at Ex. A. Accordingly, the inspector hand-delivered a notice to cure letter to Defendants. The notice stated, among other things, that:

> Any deficiency in any of the critical standards referenced in the inspection report is a default under the terms of your franchise agreement and must be cured in accordance with this notice.

### NOTICE OF DEFAULT AND NOTICE TO CURE

> The deficiencies identified ... are defaults under the franchise agreement and must be cured within 24 hours from the receipt of this notice... Your store will be re-inspected without advance notice following the expiration of time provided in this notice. If all the defaults are not cured by that time, the Company may file a lawsuit against you seeking an order from the court that you cure the defaults and pay our legal fees and costs in bringing the action. In addition, the Company may seek termination of your franchise agreement.

*Id.* at Ex. B. Defendants acknowledged receipt of the notice and inspection report. *See id.*

The inspector re-inspected Defendants' store on February 24, 2000, well after the twenty-four hour cure period. The inspection report noted continued violations. *See id.* at Ex. A. The inspector also took photographs of some of the violations. *See id.* at Ex. C.

On April 3, 2000, DDI commenced the instant litigation alleging that: (1) Defendants breached the franchise agreement; (2) Defendants' use of the Dunkin' Donuts trademark outside the scope of the franchise agreement infringed on DDI's exclusive rights in the trademarks in violation of 15 U.S.C. § 1114; (3) Defendants' use of the Dunkin' Donuts trademark outside the scope of the franchise agreement was likely to cause confusion or cause mistake as to the origin, sponsorship, or approval of their goods, services, or commercial activities in violation of 15 U.S.C. § 1125(a);

and (4) Defendants' use of the trademark outside the scope of the franchise agreement causes a dilution of the distinctive quality of the Dunkin' Donuts trademark, in violation of 15 U.S.C. § 1125(c). DDI also filed a motion for a preliminary injunction seeking an order enjoining Defendants from continuing to violate DDI's standards for health, sanitation, and safety.

## III. DISCUSSION

As previously noted, Defendants have failed to oppose the instant motion. Nevertheless, the Court has conducted an independent analysis to determine whether DDI is entitled to the relief sought.

### A. Standard for Preliminary Injunction

■ To obtain a preliminary injunction, DDI must demonstrate that: (1) absent injunctive relief, it will suffer irreparable harm, and (2) either (a) that it is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party. *See Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317, 320 (2d Cir.1999).

Because Defendants have failed to appear in opposition to the motion for a preliminary injunction and DDI has submitted sufficient evidence upon which to adjudicate the motion, the Court finds that an evidentiary hearing is unnecessary under the circumstances of this case. *See, e.g., Maryland Cas. Co. v. Realty Adv. Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir.1997).

### 1. Irreparable Harm

DDI contends that a franchisee's violation of its standards for health, sanitation, and safety constitute irreparable harm because "a franchisor lacks control over its trademarks when a franchisee fails to operate its shop in compliance with estab-

lished standards." Mem. of Law, at 7. DDI argues that continued violations of its safety, health, and sanitation standards are likely to cause injury to its reputation and goodwill, which is not easily measured in monetary terms. DDI further argues that it is likely to suffer irreparable harm because violations of these standards endangers the public health and could subject DDI to substantial tort liability.

■ In light of the significant quality control standards with which DDI requires its franchisees to comply and the evidence of non-compliance with these standards, the Court agrees with DDI that the above factors demonstrate that DDI is likely to suffer irreparable harm. This is because, as the following cases make clear, the serving of inferior, non-conforming products under DDI's name could have a detrimental impact on DDI's name and goodwill, devalue DDI's trademark, and subject DDI to a loss of business and exposure to substantial tort liability. The courts have repeatedly held that such damage is not readily quantifiable and, thus, constitutes irreparable harm.

As the Second Circuit has stated in a similar context:

> Distribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement.... The extent of loss of consumer goodwill that [the trademark holder] may suffer from the sale of some 300,000 bags of non-conforming [over-the-counter drugs] will be unquantifiable at trial. It is thus not accurately compensable by monetary damages. This satisfies the irreparable injury requirement.

*Warner–Lambert Co. v. Northside Dev. Co.*, 86 F.3d 3, 5 (2d Cir.1996).

The Eleventh Circuit reached an identical result in a similar situation involving the familiar McDonald's food chain, stating that:

McDonald's faces damage to its own reputation and loss of customers caused by the [franchisee's] distribution of an allegedly inferior (and possibly dangerous) product held out to be McDonald's. Customers would believe that they were eating McDonald's sanctioned products when they consumed improperly cooked and unsanitarily maintained food products from the [franchisee's] store. We can conceive of no realistic way to determine the damages under these circumstances.

*McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1310 (11th Cir.1998).

District courts around the country have reached like results. In a case brought by the Burger King Corporation ("BKC") against one of its franchisees seeking to enjoin the franchisee from operating its restaurants, the court stated:

If BKC is unable to control the nature and quality of the goods and services defendants provide at Burger King franchised restaurants, activities not meeting BKC standards at those restaurants could irreparably harm the goodwill associated with BKC's marks and BKC's reputation. Moreover, failure to meet some of the safety and sanitary standards here involved could subject BKC to substantial civil liability to members of the public personally injured thereby.

*Burger King Corp. v. Stephens,* 1989 WL 147557, at *10 (E.D.Pa.1989). Similarly, in a case involving the Baskin–Robbins ice cream stores (which apparently is a sister company of Dunkin' Donuts), the court found that:

The possibility of irreparable harm arises because the evidence shows that the unsanitary conditions at defendant's store may result in illness of Baskin–Robbins' customers.... If such were to occur, certainly the reputation, goodwill and business of Baskin–Robbins at large

in the country would be harmed. This constitutes irreparable harm.

*Baskin–Robbins, Inc. v. A. Ender, Ltd.,* No. CV–N–99–206, BUS. FRANCHISE GUIDE (CCH) ¶ 11,735 (D.Nev. Sept. 10, 1999).

For these reasons, the Court finds that DDI has demonstrated irreparable harm.

**2. Likelihood of Success on the Merits**

■ The Court further finds that DDI is likely to succeed on the merits. The plain terms of the franchise agreement require Defendants to comply with DDI's quality, health, and safety standards and permit DDI to inspect Defendants' store for compliance therewith. In fact, Defendants acknowledged the importance of maintaining such standards. The evidence submitted by DDI tends to support it's claims that Defendants violated various quality, health, and safety standards.

Upon a finding of non-compliance, Defendants had twenty-four hours to cure the deficiencies. In actuality, DDI afforded Defendants substantially more than twenty-four hours prior to re-inspection. Nonetheless, Defendants appear to have failed to cure the deficiencies within the allotted time, as demonstrated by the evidence submitted by DDI. Thus, it is likely that DDI will succeed on its breach of contract claim. *See McDonald's,* 147 F.3d at 1309.

Moreover, "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark," *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir.1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). Thus, because Defendants are selling products under DDI's tradename that do not conform to DDI's quality, safety, and health specifications, it is likely that there will be confusion as to the source of Defendants' products or that

the value of DDI's tradename will be diminished, and DDI will succeed on one or all of its Lanham Act claims. *See McDonald's,* 147 F.3d at 1309; *Warner–Lambert Co.,* 86 F.3d at 5–8; *Burger King,* 1989 WL 147557, at *8–10.

At the very least, for the reasons discussed, there are fair grounds for litigation and the balance of hardships decidedly tip in favor of DDI in light of the dangers posed to the public and DDI's name and goodwill and the insubstantial burden that would be imposed upon Defendants by requiring them to comply with their obligations under the franchise agreement.

### 3. Security

■ Rule 65 provides that "[n]o ... preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The Court finds that it is not necessary under the circumstances of this case for DDI to post bond because there is no evidence, or likelihood, that Defendants will suffer any costs or damages if it is later found that they have been wrongfully enjoined or restrained. *See Doctor's Assocs., Inc. v.*

*Stuart,* 85 F.3d 975, 985 (2d Cir.1996) ("[T]he District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm."). All that is being asked of Defendants is that they comply with the terms of the franchise agreement and the operating manuals and operate a clean, safe, and healthy donut shop. Requiring them to do so should not cause them any unnecessary expense or loss and certainly not subject them to any costs beyond that which they seemingly should now be spending to safely operate their shop.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS DDI's motion for a preliminary injunction. Accordingly, Defendants are hereby **ORDERED** to cease violating DDI's standards for health, sanitation, and safety, and, specifically, those identified on the February 24, 2000 Critical Food Safety Inspection form, which is annexed hereto and incorporated herein as Appendix 1, *see* FED.R.CIV.P. 65(d), within eight (8) days of the date of this Memorandum—Decision & Order.

**IT IS SO ORDERED.**

PC # / Store # __300471__     Store Location: __Central Ave, Albany__

## ALLIED DOMECQ QSR

## CRITICAL FOOD SAFETY AND SANITATION INSPECTION

### NOTICE OF DEFAULT     NOTICE TO CURE

YOUR STORE HAS BEEN INSPECTED AND THE FOLLOWING VIOLATIONS OF STANDARDS RELATING TO FOOD SAFETY, AND/OR SANITATION WERE FOUND. YOU ARE HEREBY NOTIFIED OF THE FOLLOWING DEFICIENCIES WHICH MUST BE CORRECTED WITHIN TWENTY-FOUR (24) HOURS FROM RECEIPT OF THIS NOTICE. IF THE VIOLATIONS ARE NOT CORRECTED, YOUR FRANCHISE MAY BE TERMINATED. IF IT SHOULD BE DETERMINED THAT, AS A MATTER OF LAW, A LONGER CURE PERIOD IS REQUIRED, THEN THAT LONGER PERIOD IS APPLICABLE TO THIS NOTICE.

| | RFSS Manual Page # | Photo ID Key | Inspection Date: 2/16/00 "No" = Deficiency | | | Re-Inspection Date: 2/24/00 Cured | New Deficiency |
|---|---|---|---|---|---|---|---|
| **FOOD - RECEIVING** | | | | | | | |
| Are refrigerated products received at 41° F maximum, with temperatures and observations documented for each delivery? | 10 | FR 01 | Yes | (No) | N/A | (Yes) | No |
| **FOOD - STORAGE** | | | | | | | |
| Are refrigerated products stored at 41° F maximum, and temperatures documented twice a day?  *Clarify logs - specific units* | 11 | FS 01 | Yes | (No) | N/A | Yes | (No) |
| Are all food products dated and within their code date?  *Cream cheese out of date* | 11 | FS 02 | Yes | (No) | N/A | Yes | (No) |
| Are all food products approved by the respective brand and from an approved source? (e.g., no raw shell eggs) | 10 | FS 03 | (Yes) | No | N/A | (Yes) | No |
| **FOOD - PREPARATION** | | | | | | | |
| Are all frozen foods thawed refrigerated at 41° F maximum? | 11 | FP 01 | (Yes) | No | N/A | (Yes) | No |
| **FOOD - COOKING / REHEATING** | | | | | | | |
| Are Bulk Food Items (soup, meat, chili,) cooked or reheated (leftovers) in approved equipment to 165° F (or 140' F depending on product) for 15 seconds minimum, and temperatures documented? Foods that can be stirred should be stirred prior to temperature checking. | 12, 14 | FCR 01 | Yes | No | (N/A) | Yes | No |
| Are Dunkin' Donuts pre-portioned breakfast items and soups cooked in an approved microwave to 165°F (or 140°F depending on product) for 15 seconds minimum and temperatures documented for each product once daily? Foods that can be stirred should be stirred prior to temperature checking | 12 | FCR 02 | (Yes) | No | N/A | (Yes) | No |
| **FOOD - HOT HOLDING** | | | | | | | |
| Are potentially hazardous foods held at 140° F minimum, and temperatures documented every 4 hours during holding? | 13 | FHH 01 | Yes | No | (N/A) | Yes | No |
| **FOOD - COLD HOLDING** | | | | | | | |
| Are refrigerated foods stored at 41° F maximum, and temperatures documented every 4 hours during holding? | 13 | FCH 01 | (Yes) | No | N/A | (Yes) | No |
| **FOOD - COOLING LEFTOVERS** | | | | | | | |
| Are leftovers cooled using the Standardized Cooling Procedure (leftovers no more than 2" deep, uncovered on top shelf of walk-in cooler) with depth and final temperature documented? | 14 | FCL 01 | Yes | No | (N/A) | Yes | No |
| **FOOD - DELIVERY / DISTRIBUTION** | | | | | | | |
| Are refrigerated products maintained at 41° F or below throughout delivery (including inter-store delivery), and temperatures documented at each delivery point? | 14 | FDD 01 | Yes | No | (N/A) | Yes | No |
| Are Togo's lunch items delivered within one hour and time documented? | 14 | FDD 02 | Yes | No | (N/A) | Yes | No |
| Are food products protected from contamination throughout delivery? (e.g., covered, off the vehicle floor) | 14 | FDD 03 | (Yes) | No | N/A | (Yes) | No |
| **FOOD - THERMOMETERS** | | | | | | | |
| Are food probe thermometers in use, accurate, and sanitized properly? | 9, 36 | FT 01 | (Yes) | No | N/A | (Yes) | No |
| **CHEMICAL CONTROLS** | | | | | | | |
| Are chemicals properly labeled and stored below or away from food and away from packaging? | 19 | CC 01 | (Yes) | No | N/A | (Yes) | No |
| Are chemicals approved and used in accordance with manufacturer's instructed use? | 19 | CC 02 | (Yes) | No | N/A | (Yes) | No |

300471

## PEST CONTROL

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Is store free of pests (e.g. no evidence of rodents, insects, or birds) | 20 | PC 01 | (Yes) | No | N/A | (Yes) | No | |
| Are pesticides stored off-site and when used, only applied by licensed pest control operator? | 20 | PC 02 | (Yes) | No | N/A | (Yes) | No | |

## PLUMBING

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| If well water is used, is there documented evidence that it meets Federal, State, and local standards? | 15 | PL 01 | Yes | No | (N/A) | Yes | No | |
| Are hot and cold water available at all sinks? | 15 | PL 02 | (Yes) | No | N/A | (Yes) | No | |

## PHYSICAL PREMISES

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Is the store free of imminent health hazards? (e.g., sewer backup, alleged illness outbreaks, adulterated products, power outage) | 21 | PP 01 | (Yes) | No | N/A | (Yes) | No | |
| Are premises clean and maintained (e.g. non-food contact surfaces including dumpster area, restroom, toilets, sinks, floors, walls, ceilings, storeroom and restroom supplies available) finished product racks-clean, clean flrs, walls | 20, 43 - 46 | PP 02 | Yes | (No) | N/A | Yes | (no) | |

## SANITATION

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Are equipment and utensils washed, rinsed and sanitized at proper frequency? (e.g. softserve freezer, dairy dispenser, dipperwells, iced tea dispensers, meat slicer, blender pitchers, spindle-type mixers, iced coffee dispenser, tomato slicer)? | 16 - 18 43 - 46 | SN 01 | Yes | (No) | N/A | (Yes) | No | |
| Are two or three-compartment sinks set up properly (wash, rinse, sanitize, air-dry)? | 15 | SN 02 | (Yes) | No | N/A | Yes | (No) | ✓ |
| Are sanitizer solutions clean and of adequate concentration and test strips used? | 15 | SN 03 | Yes | (No) | N/A | Yes | (No) | |
| Are in-use wiping cloths stored in sanitizing solution? | 15 | SN 04 | (Yes) | (No) | N/A | Yes | (No) | |
| Are necessary brushes and cleaning utensils available and in use? | 16 - 18 | SN 05 | (Yes) | No | N/A | (Yes) | No | |
| Are utensils stored properly (e.g. on a clean dry surface or in product, not in standing water and dipper well water running)? | 12 - 13 | SN 06 | Yes | (No) | N/A | (Yes) | No | |

## SELF-ASSESSMENT

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Are Retail Food Safety System Self-Assessments being completed accurately on a monthly basis and corrective actions taken? | 24 - 29 | SA 01 | Yes | (No) | N/A | Yes | (No) | |
| Were coliform tests conducted by Franchisee (minimum 2 per month and each item retested until results are within specification)? | 24 - 25 | SA 02 | Yes | No | (N/A) | Yes | No | |

## MICRO-COLIFORMS

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Are coliform tests performed by the AD QSR representative acceptable (<20 CFU/ml) for product or water samples (e.g. softserve, dipperwell water, iced tea, spindle mixer rinse water, cream) and food contact surfaces (e.g. ice machine, dairy dispenser, utensils, blender pitchers, tea/coffee spigots, mixers, slicers)? | 24 - 25 | CF 01 | Yes | No | (N/A) | Yes | No | |

## HYGIENE

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Are employees free of illness symptoms (nausea, vomiting diarrhea, uncontrolled sneezing or coughing) or not confirmed with one of the following illnesses: E. coli 0157:H7, Hepatitis A, Shigellosis or Salmonellosis | 6 | HY 01 | (Yes) | No | N/A | (Yes) | No | |
| Do the employees and store manager understand AD QSR's standard for ill Employees? | 6 | HY 02 | (Yes) | No | N/A | (Yes) | No | |
| Are handwash sinks provided, working properly, dedicated for hand washing only, and supplied with liquid antibacterial soap and single use paper towels or air dryer? | 6 - 7 | HY 03 | (Yes) | No | N/A | (Yes) | No | |
| Is there no direct hand contact with ready-to-eat food? | 6 | HY 04 | (Yes) | No | N/A | (Yes) | No | |
| Are single-use gloves and bandages available for use? | 6 | HY 05 | (Yes) | (No) | N/A | (Yes) | No | |
| Are all employees demonstrating proper hygiene? (e.g., washing hands after any interruption of work, bandaging and covering cuts, burns, scratches, properly using single-use gloves) | 6 - 7 | HY 06 | (Yes) | No | N/A | (Yes) | No | |

## FOODS PROTECTED

| Question | Points | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Are foods protected from contamination? (e.g. off floor, covered, not under leaking pipes, shielded from sink, not stored under condensation, not at room temperature for more than 30 minutes, un-processed produce washed in a colander, leftovers not mixed with new foods and used only once, ice scoop not stored in ice machine, no personal belongings stored on food or packaging) | 10 - 14 | FP 01 | Yes | (No) | N/A | (Yes) | (No) | |
| Are food allergen risks addressed? (e.g., foods properly labeled, batters containing nuts are scheduled for preparation last, food equipment and food contact surfaces are thoroughly washed after the preparation of products containing nuts, nut products stored below non-nut items) | 11 - 13 | FP 02 | Yes | No | (N/A) | Yes | No | |

PCH 0471

DETAILS (Clarify deficiencies as necessary, Items tested and test results)

First Inspection:

Company Representative: _Kevin Wright_
(signed)

_Kevin Wright_
(printed)

Date: 2/16/00

Franchisee/Manager: (signed)

Alla H. MUSTAFA
(printed)

Date: 2/16/00

Reinspection:

Company Representative: (signed)

_Kevin Wright_
(printed)

Date: 2/24/00

Franchisee/Manager: (signed)

Alla H MUSTAFA
(printed)

Date: 2/24/00

CFSSI 11/16/99 Revision                3