**DUNKIN' DONUTS INC.**
**et alia, Plaintiffs,**

v.

**NORTHERN QUEENS BAKERY,**
**INC. et alia, Defendants.**

**No. CIV–01–4817 CPS.**

United States District Court,
E.D. New York.

Dec. 14, 2001.

Ronald D. Degen, O'Rourke & Degen, New York City, Robert L. Zisk, David E. Worthen, Craig M. Cibak, for Dunkin' Donuts.

Gail E. Spindler, Trop & Spindler, Jamaica Hills, NY, for Defendants.

## MEMORANDUM AND ORDER

SIFTON, Senior District Judge.

Plaintiffs Dunkin' Donuts Incorporated, Dunkin Donuts USA, Inc., and Third Dunkin' Donuts Realty Inc. bring this action for breach of contract, trademark infringement, trade dress infringement, and unfair competition against corporate defendants Northern Queens Bakery Inc., Freeport Long Island Bakery Corp., Astoria Queens Bakery Corp., and individual defendants Kwang Nam Park ("Park") and Chin K. Lim ("Lim"). Currently before this Court

is plaintiffs' motion for a preliminary injunction enjoining all defendants from operating the Dunkin' Donut franchise shops at their addresses pending the outcome of this litigation.

For the reasons set forth below, plaintiffs' application for a preliminary injunction is granted. What follows constitutes this Court's findings of fact and conclusions of law as required by Rule 65 of the Federal Rules of Civil Procedure.

## BACKGROUND

The following facts are drawn from the complaint, the affidavit and exhibits in support of plaintiffs' motion for a preliminary injunction, and defendants' submissions in opposition.

Dunkin' Donuts Incorporated ("Dunkin'") franchises individuals and businesses to operate Dunkin' shops throughout the United States. Dunkin' franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin' and to operate under the Dunkin' "system," which provides for the production, merchandising, and sale of donuts and related products utilizing a specially designed building with special equipment, layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, and proprietary marks.

Plaintiff Dunkin' Donuts, USA, Inc. is a wholly-owned subsidiary of Dunkin', and is the owner of the Dunkin' trademark, service mark, and trade name "Dunkin' Donuts" and related marks.[1] Dunkin' has the exclusive license to use and license others to use these marks and has used them continuously since approximately 1960 to identify its donut shops. Currently, Dunkin' and its franchisees operate approximately 3,700 donut shops in the United States and 1,400 shops outside the United States.

Third Dunkin' Donuts Realty, Inc. ("Dunkin' Realty") is also a wholly-owned subsidiary of Dunkin' and is engaged in the business of leasing properties to Dunkin' Donuts franchisees to enable them to operate Dunkin' Donut shops at these locations.

The defendant bakeries were all operated as Dunkin' Donut shops pursuant to agreements with Dunkin'. Northern Queens Bakery, Inc. is a New York corporation, with its principal place of business located at 70–16 Northern Boulevard, Jackson Heights, New York. Pursuant to a franchise agreement between Northern Queens Bakery, Inc. and Dunkin', dated June 5, 1992 ("Jackson Heights Franchise Agreement"), defendant operated a Dunkin' Donuts store ("Jackson Heights Shop"), where it produced and sold donuts, using the Dunkin' Donuts trademarks, trade name, and trade dress. Astoria Queens Bakery Corp. is a New York corporation located at 3108 30th Avenue, and pursuant to a franchise agreement with Dunkin' Donuts dated May 5, 1993 ("Astoria Franchise Agreement"), it operated a Dunkin' Donuts at its address ("Astoria Shop"). The Astoria Shop did not produce donuts on site but, rather, sold donuts produced by the Jackson Heights Shop. Defendant Freeport Long Island Bakery Corp. is a New York corporation, located at 3537 East Sunrise Highway, Freeport, New York. Pursuant to a franchise agreement dated April 21, 1994 ("Freeport Franchise Agreement"), defendant operated a Dunkin' Donuts at its address ("Freeport Shop").

Individual defendants Park and Chin are natural persons and residents of the State

---

1. Specifically, Dunkin' Donuts USA, Inc. owns federal registrations including Registration Nos. 748,901, 1,148,165, and 1,159,354.

Plaintiffs allege that each of their registrations is in full force and effect and incontestable pursuant to 15 U.S.C. § 1065.

of New York. Chin is an officer or shareholder of the Jackson Heights, Freeport and Astoria Shops, and Park is an officer or shareholder of the Jackson Heights and Astoria Shops. In their capacity, they executed personal guarantees as part of the franchise agreements, pursuant to which defendant Chin promised to personally perform and be bound by the Jackson Heights, Freeport, and Astoria Franchise Agreements, and Park promised to be bound by the Jackson Heights and Astoria Franchise Agreements. Both defendants were individually licensed to use Dunkin' trademarks, trade names, and trade dress.

### Leases and Lease Agreements

The shops are all subject to leases between the defendant corporations and Dunkin' or a Dunkin' subsidiary. The Freeport Shop and Lim entered into an Agreement to Transfer a Dunkin' Donut Shop by the Sale of Assets ("Agreement to Transfer") on April 24, 1994, with Freeport Donuts, Inc., Dunkin', and Dunkin' Donuts of New York, Inc., a predecessor in interest to Dunkin' Realty. Pursuant to the Agreement to Transfer, Freeport Donuts, Inc. assigned and transferred its interest in a lease, as amended, for the premises, originally entered into on April 12, 1982 ("Freeport Lease"). As part of the transaction, Lim personally agreed to perform all duties and obligations of the Freeport Bakery under the Freeport Lease. The Freeport Lease provides the following term:

> The LESSEE warrants that a Franchise Agreement between the LESSEE and DUNKIN' DONUTS OF AMERICA, INC., to operate the DUNKIN' DONUTS SHOP is in full force and effect and that this LEASE is subject to said Franchise Agreement remaining in full force and effect. If said Franchise Agreement is terminated for any reason, then the LESSOR shall have the right to terminate this LEASE.

The Jackson Heights Shop leases its location in Jackson Heights pursuant to a lease dated April 20, 1988 ("Jackson Heights Lease"). Pursuant to an Assignment of Lease Option Agreement ("Jackson Heights Assignment"), dated June 5, 1992, between the prior lessee and Dunkin' franchisee of the Jackson Heights Shop premises, Insoo Chang, defendant Northern Queens Bakery, Inc. assumed the rights and obligations set forth in the Lease Option Agreement dated January 27, 1989 ("Jackson Heights Lease Option Agreement"), between Theodore Metalios, the lessor, and Insoo Chang, the lessee, and Dunkin'. The stated purpose of the Jackson Heights Lease Option Agreement is "to provide Dunkin' with the opportunity to preserve the premises as a DUNKIN' DONUTS SHOP, should the Lease or the Franchise Agreement be terminated." It also provides that obligations and rights under the agreement "run with the land and [are] binding upon the parties hereto and their successors, assigns, executors and administrators and representatives." Under the terms of these agreements, Northern Queens Bakery, Inc. agreed to assign all of its right, title, and interest in the Jackson Heights Lease to Dunkin' upon Dunkin's request.

The Astoria Shop leases its Astoria location pursuant to a lease of April 30, 1991 ("Astoria Shop Lease"). Pursuant to an Assignment of Lease Option Agreement ("Astoria Shop Assignment"), dated May 3, 1993, between Kisseena Donuts, Inc., the previous franchisee of the Astoria location, and Astoria Bakery, Astoria Bakery assumed the rights and obligations set forth in the Lease Option Agreement dated May 15, 1991 ("Astoria Bakery Lease Option Agreement"), between Genovese Estates Corp., the lessor, Kisseena Donuts, Inc., the lessee, and Dunkin'. The stated purpose of the Astoria Shop Lease Option Agreement is "to provide Dunkin' with the

opportunity to preserve the premises as a DUNKIN' DONUTS SHOP, should the Lease or the Franchise Agreement be terminated." Under the agreements by which Astoria is bound, the Astoria Shop designated both the lessor and Dunkin as its agents to execute any documents and agreements and to take any action necessary to effectuate the assignment of the Lease and the relinquishment of any rights Astoria Shop may have under the lease in the event that the Astoria Franchise Agreement is terminated. The Astoria Lease Option Agreement also provides that the rights and obligations run with the land and are binding on all successors.

### Franchise Agreements

Once bound by a Dunkin' franchise agreement, the defendants were obligated to follow Dunkin' manuals and guidelines,[2] which set forth in detail the procedures, methodology and standards applicable to the operation of a Dunkin' Donuts and the maintenance of the franchise. The franchise agreements contain acknowledgments and agreements by the defendants that they will maintain the Dunkin' standards for health, sanitation, and safety. In addition, defendants agreed that they would not perform any act injurious or prejudicial to the goodwill associated with the Dunkin' proprietary marks and the Dunkin' system.

The franchise agreements contained provisions concerning the use of the Dunkin' proprietary marks after any termination of the franchise agreements. All three franchise agreements include the following language:

7.A. FRANCHISEE acknowledges that "DUNKIN' DONUTS" is a registered trademark, that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees, that said mark, together with the other PROPRIETARY MARKS, presently owned by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the DUNKIN' DONUTS SYSTEM and that valuable goodwill is associated with and attached to said mark and the other PROPRIETARY MARKS. FRANCHISEE agrees to use said mark and the other PROPRIETARY MARKS only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE further agrees that any unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm.

9.F. Upon any termination or expiration of this Agreement:

9.F.2. FRANCHISEE shall immediately cease to use, by advertising or in any other manner whatsoever, any methods associated with the name "DUNKIN' DONUTS", any or all of the PROPRIETARY MARKS and any other trade secrets, confidential information, operating manuals, slogans, signs, symbols or devices forming part of the DUNKIN' DONUTS SYSTEM or otherwise used in connection with the DUNKIN' DONUTS SHOP. FRANCHISEE agrees that any unauthorized use or continued use after the termi-

---

2. These manuals and guidelines include the Network Administration Manual, which includes chapters entitled Operations Assessment for Customer Satisfaction, Building and Site Maintenance, Sanitation, and Standards; the Production and Distribution Manual, which includes detailed chapters on Cleaning, Sanitizing and Maintaining Production Area Equipment; the Customer Service Manual, which includes chapters entitled Receiving and Storing Raw Materials, Service Procedures, Procedure for Brewing and Serving Coffee, Heating and Serving Bakery Products, Making and Serving Sandwiches, Procedures for Preparing and Serving Soup, and Cleaning, Sanitizing, and Maintaining Sales Area Equipment; and the Retail Food Safety Manual.

nation of this Agreement shall constitute irreparable harm subject to injunctive relief.

In addition, by addendum to the Astoria Franchise Agreement, should the Jackson Heights Franchise Agreement be terminated, the Astoria Franchise Agreement is also to be terminated because the Astoria location does not produce its own donuts but is rather a satellite location of the Jackson Heights Shop.

*Failed Inspections*

Beginning in May 2001, Dunkin' conducted its most recent inspections and re-inspections of the Jackson Heights Shop, the Freeport Shop, and the Astoria Shop.

1. *Jackson Height Shop.* On May 18, 2001, Jeff Polizotto ("Polizotto"), an employee of Allied Domecq Quick Service Restaurants ("Allied"), Dunkin's' parent company, conducted an inspection of the Dunkin' Donuts Shop franchised by Northern Queens Bakery, Inc. in Jackson Heights. Polizotto noted several deficiencies during the inspection on the check-list inspection report. According to the inspection report check-off list, the following deficiencies were noted: food was not stored properly under cold enough temperatures, chemicals were not properly labeled or stored below or away from food and packaging, the store was not free of pests, the premises were not clean and maintained, and sanitizing solution was not of adequate concentration, employees were not all demonstrating proper hygiene, and employees did not have a handwash sink, dedicated to use for hand-washing only. In a section on the inspection report for handwritten comments, Polizotto noted the following problems, "Donut racks with [illegible] on garbage pails, rags out of sanitizer, handsink not dedicated, cream at 50 [degrees], must accurately maintain self-assessments."

On the day of the inspection, Polizotto hand delivered a document entitled Notice of Default and Notice to Cure ("Default–Cure Notice") to the an employee at Northern Bakery. The Default–Cure Notice stated in pertinent part:

The deficiencies identified in the attached Inspection Report are defaults under the Franchise Agreement and must be cured within 24 hours from the receipt of this Notice. If you are unable to cure a deficiency or deficiencies within the designated cure period, you should immediately contact your Business Consultant to discuss the matter and to request an extension of time to cure the deficiency. Any extension of time must be in writing. Receipt of this Notice is effective upon personal delivery to the store. If it should be determined, as a matter of law, that a longer cure period is required, then that longer period of time is applicable to this Notice.

Your store will be re-inspected without Notice following the expiration of time provided in this Notice. If all of the defaults are not cured by that time, the Company may file a lawsuit against you. . . . In addition, the Company may seek termination of your Franchise Agreement.

On May 29, 2001, Polizotto re-inspected the Jackson Heights Shop. According to his re-inspection report, all of the previously observed check-list deficiencies were still present. Of the handwritten deficiencies, defendants had cured the problem with the donut racks and garbage pail, the cream temperature, and was performing the self-assessment. Northern Bakery still had a problem with the rags out of the sanitizer and no hand-sink dedicated to hand-washing.

2. *Astoria Shop.* On May 18, 2001, Polizotto conducted an inspection of the Asto-

ria Shop. During that inspection he observed and recorded deficiencies on the check-list inspection report. Specifically, Polizotto observed the following deficiencies: food not all dated and within code date, food products not all approved by the respective brand and from an approved food source, food not properly refrigerated, chemicals not all properly labeled, stored or used in accordance with manufacturer's instructed use, store not free of pests, premises not clean and maintained, equipment not properly sanitized and sanitizer solution of inadequate concentration, inadequate self-assessment, no handwash sink, food not protected from contamination, and food allergen risk not addressed. In an area for handwritten inspection details, Polizotto wrote that he observed "sanitizer at improper concentration, rags out of sanitizer, handsink not dedicated."

Polizotto provided an employee at the Astoria Shop with a Default–Cure Notice identical to the one described above with respect to the Jackson Heights Shop. On May 29, 2001, Polizotto re-inspected the Astoria Bakery and found many of the deficiencies to still exist, as well as some new deficiencies in the area of sanitation. Polizotto took photographs upon his re-inspection of the store, which have been provided to and looked over by this Court.

3. *Freeport Shop.* On June 19, 2001, Polizotto inspected the Freeport Shop. Polizotto observed and recorded deficiencies in almost every category on the check-list inspection sheet. According to Polizot-

to, food was improperly received, stored, prepared, cooked, reheated, refrigerated and not protected from contamination risks. Food thermometers were not properly used or cleaned, and chemicals were being used improperly and not in accordance with manufacturer's intended use. Polizotto observed the store to have a problem with pests and other "imminent health hazards" and to be not clean or maintained. The store also had problems with its sanitation, including inadequately concentrated sanitizing solution, and there were no handwash sinks. Polizotto also noted that there was a problem addressing food allergen risks. In the area for handwritten comments, Polizotto noted the following: "thermometer out of batteries, logs not kept, 3 compart sink not set up." Polizotto presented a Freeport Bakery employee at the location with a standard Default–Cure Notice.

The next day, June 20, 2001, Polizotto returned to the Freeport Shop to conduct a re-inspection. Of the handwritten comments, Freeport Shop cured the problems presented by the thermometer and the three-compartment sink. Of the check-list deficiencies, Polizotto noted that some corrections were made in the areas of food receiving,[3] food storage,[4] and all corrections required were made in the area of food cooking/reheating,[5] and food allergen risks.[6] According to the check-list inspection report, the Freeport Bakery also completely cured the problem with its food thermometers and its usage of chemicals.

3. The problem was apparently that refrigerated products were not received at 41 degrees or that temperatures were not properly documented on delivery.

4. At the re-inspection, Polizotto found no food products that were not dated and within their code date. Polizotto checked off that there was no cure in the other food storage areas: food was not properly refrigerated and not all

food products were approved by their respective brand or from an approved source.

5. The deficiency that was cured involved the proper preparation of pre-portioned Dunkin' Donuts breakfast items and soups prepared in a microwave.

6. The problem here involved isolating and minimizing risks posed by common food allergens, such as nuts.

There was also an improvement noted in the area of sanitation because, as noted above, the three-compartment sink was set up. Upon re-inspection, Polizotto found the following deficiencies to still exist: a pest problem was observed,[7] the physical premises still presented "imminent health hazards" [8] and were not clean or maintained, some sanitation problems were not cured,[9] there was no handwash sink provided, employees were not demonstrating proper hygiene, and food was not protected from contamination.[10]

### Prior Litigation between Parties

There are two prior instances of litigation between the parties over alleged breaches of the franchise agreements due to violations of health, sanitation, and safety. On March 24, 1997, plaintiffs filed a claim for injunctive relief in state court against Lim, Park, and Northern Queens Bakery, Inc.[11] This case was discontinued by consent of the parties after defendants cured the health and safety threats posed by the alleged franchise violation. A second claim for injunctive relief was filed by plaintiffs in federal court on April 12, 2000, against Lim, Park, Northern Queens Bak-

ery, Inc. and Freeport Long Island Bakery Corp., styled *Dunkin' Donuts Incorporated v. Chin K. Lim et al.*, 00–CV–2113 (RJD). This case was also discontinued on consent after defendants cured the alleged health and safety violations.

### Termination of Franchise Agreements and Leases

Based on the inspections of May and June, 2001, plaintiffs terminated all three franchise agreements. On July 6, 2001, Dunkin' sent Park and Lim a Notice of Termination of the Franchise Agreements ("Franchise Termination Notice") for the Jackson Heights Shop, the Freeport Shop, and the Astoria Shop. In addition, Dunkin' stated that by this Franchise Termination Notice and pursuant to the Freeport Lease, Dunkin' elected to terminate the Freeport Lease.[12] Dunkin' demanded that defendants comply with post-termination obligations set forth in the franchise agreements, including ceasing the use of all Dunkin' proprietary marks and returning all Dunkin' manuals.

In conclusion, the Franchise Termination Notice informed defendants that, to the extent that defendants had any

---

7. There is nothing more specific about a pest problem than the check-list question which reads in full: "Is the store free of pests? (e.g. no evidence of rodents, insects, or birds)".

8. The check-list question reads in full: "Is the store free of imminent health hazards? (e.g. sewer backup, alleged illness outbreaks, adulterated products, power outage)".

9. Specifically, Polizotto observed that in-use wiping cloths were not being stored in sanitizing solution, necessary brushes and cleaning utensils were either not available or not in use (or both), and utensils were not stored properly.

10. The only information about this deficiency is provided by the check-list question, which states, in full:
   Are foods protected from contamination? (e.g. off floor, covered, not under leaking pipes, shielded from sink, not stored under

condensation, not at room temperature for more than 30 minutes, un-processed produce washed in a colander, leftovers not mixed with new foods and used only once, ice scoop not stored in ice machine, no personal belongings stored on food or packaging).

11. *Dunkin' Donuts Inc. v. Northern Queens Bakery, Inc., Kwang Nam Park, and Chin K. Lim* (Index No. 007167/97)

12. As for the Jackson Heights Lease and the Astoria Lease, which were subject to the above described Lease Option Agreements, Dunkin' acknowledged that it has the option to assume the lease for the franchised business and may elect to exercise that option. This option was ultimately elected on August 3, 2001.

planned remodels or capital expenditures upcoming, defendants could "hold the remodels or capital expenditures in abeyance until the court has ruled on the termination of the franchise." Alternatively, Dunkin' informed defendants that they may continue any such plans but that the "decision to remodel or invest will not affect the termination of the franchises and you will be acting at your own risk should the terminations be enforced by the court."

On August 3, 2001, Dunkin' sent written notices to the defendants and the landlords of the Jackson Heights Shop and Astoria Shop locations exercising its rights under the respective lease option agreements to assume their rights under the leases. To date, none of these premisses has been relinquished by the defendants.

The present complaint was filed on July 20, 2001, and states claims for relief based on Section 32 of the Lanham Act, 15 U.S.C. § 1114, for trademark and trade name infringement, and Section 43 of the Lanham Act, 15 U.S.C. § 1125, for trade dress infringement, based on the holdover use of the Dunkin' marks after Dunkin's termination of defendants' franchise agreements. Plaintiff also sues for breach of the franchise agreements and the terms of the Freeport Lease. The present motion for preliminary injunction was filed in this Court on August 22, 2001.

### Defendants' Response

Defendants have responded to plaintiff's motion for preliminary injunction, first, by arguing that plaintiffs wrongfully terminated the franchise agreements since the deficiencies found at the three locations during inspections were minor and trivial and immediately corrected; second, by claiming that in all three instances Polizotto served the Default–Cure Notice on the defendants in a manner different from that proscribed by the franchise agreements; third, by arguing that plaintiffs breached the franchise agreements and/or covenants of good faith and fair dealing by terminating the franchises on the eve of substantial renovations organized and partially paid for by the defendants; and finally, by arguing that plaintiffs have failed to show (1) that they own the trademarks and other Dunkin' marks, or (2) that they will suffer irreparable harm in the absence of a preliminary injunction.

### DISCUSSION

■ To obtain a preliminary injunction, plaintiffs must demonstrate that: (1) absent injunctive relief, it will suffer irreparable harm, and (2) either (a) that it is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party. *See Statharos v. New York City Taxi and Limousine Comm'n,* 198 F.3d 317, 320 (2d Cir.1999).

### *Irreparable Harm*

■ Dunkin' contends that the defendants' violations of the franchise agreements with respect to the standards for health, sanitation and safety, coupled with their allegedly unlawful continued usage of the Dunkin' marks, harm them irreparably. Dunkin's' argument is that they are harmed by the loss of control over its registered mark and the inability to control the reputation and goodwill of that mark. By using the mark after the alleged termination of the franchise agreements, Dunkin' fears it can no longer control the quality of goods and services provided by defendants under the guise of being affiliated with Dunkin' Donuts. As a result, customers, who believe they are dealing with authorized Dunkin' Donuts franchises, may receive goods and services that do not meet Dunkin' stan-

dards, which could damage Dunkin's reputation and result in the loss of customers.

Defendants argue that there is no irreparable harm because "defendants find themselves *promoting* plaintiffs' trademarks for free, advertising plaintiffs' name, [and] building up plaintiffs' good will." (Defs.' Opp. at ¶ 40) (emphasis in original). This is exactly the type of *promotion*, however, that the plaintiffs are seeking by this motion for preliminary injunctive relief to stop, due to the fact that these three establishments are in violation of Dunkin' standards for health, sanitation, and safety, and the defendants have breached the franchise agreements.

■ Courts have repeatedly held in situations similar to this one that damages to a business's goodwill as a result of unauthorized trademark usage are not readily quantifiable and, thus, constitute irreparable harm. *See Dunkin' Donuts Incorporated v. Albireh Donuts, Inc.*, 96 F.Supp.2d 146, 149 (N.D.N.Y.2000). Trademark laws are designed to protect the public from confusion over the source of goods or services. *Hermes International v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 107–108 (2d Cir.2000). Where the party seeking a preliminary injunction in a trademark case shows that it will "lose control over the reputation of its trademark pending trial," the requirement of irreparable injury is satisfied. *Power Test Petroleum Distributors v. Calcu Gas*, 754 F.2d 91, 95 (2d Cir.1985). A trademark "epitomizes the goodwill of a business. This creation and perpetration of goodwill depends on customer recognition. The nature of goodwill is dictated by the consumer's desire to do business with the same seller. The buyer expects the same experience with each purchase—this is the reason *d'etre* for the sale." *Id.* at 97. The need to issue a preliminary injunction where a former licensee continues

to use a trademark after its license to do so has been revoked is compelling because of the danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder. *Church of Scientology Intern. v. Elmira Mission*, 794 F.2d 38, 41–42 (2d Cir.1986).

Defendants argue that plaintiffs must not be suffering irreparable harm because plaintiffs continue to supply the defendants with Dunkin' Donuts products and supplies, including napkins, logos, and trademarks, most of which contain the Dunkin' mark, and that plaintiffs continue to accept the franchise fee from the defendants. However, there is no dispute that defendants are being supplied by an independent contractor and not by Dunkin'. Moreover, pursuant to an explicit term in each of the franchise agreements, Dunkin's acceptance of the franchise fee shall not constitute a waiver of a breach of the franchise agreement.

In conclusion, if defendants are presently operating the Jackson Heights Shop, Freeport Shop, and Astoria Shop as Dunkin' Donut shops, despite a breach and termination of the franchise agreements, plaintiffs are being irreparably harmed by the trademark and trade dress infringement.

### Likelihood of Success

■ 1. *Termination of Franchise Agreements.* Plaintiffs argue that defendants' failure to maintain the standards imposed by the franchise agreement constituted breaches of these agreements and that, furthermore, defendants failed to cure the violations in the time allotted by the contract. Defendants do not contest the validity of the franchise agreements but, rather, argue that (1) the violations were minor and, to the extent reasonably possible, easily cured, (2) the violations were of such nature that required more than 24 hours to cure, (3) at the time of the

inspection the defendants were in the process of completely renovating some or all of the locations, and (4) the franchise agreements were improperly terminated because the three Default–Cure Notices were served on them in a manner not authorized by the franchise agreements. None of these defenses are likely to succeed at trial.

All the franchise agreements provide the following terms, which plaintiffs argue have been breached by the defendant:

5. FRANCHISEE understands and acknowledges that every detail of the DUNKIN' DONUTS SYSTEM is important to DUNKIN' DONUTS, to the FRANCHISEE and to other FRANCHISEES in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities, products and techniques to increase the demand for DUNKIN' DONUTS' products and to protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

FRANCHISEE also agrees:

5.A. To use all materials, ingredients, suppliers, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction, and methods of product preparation and delivery prescribed by or which conform to DUNKIN' DONUTS' standards and specifications and to carry out the business covered by this Agreement in accordance with the operational standards and specifications established by DUNKIN' DONUTS and set forth in DUNKIN' DONUTS' operating manuals.

5.B. To refrain from ... selling any products ... which do not meet DUNKIN' DONUTS' standards and specifications.

. . . .

5.F. To maintain, at FRANCHISEE's expense, at all times, the interior and exterior of the DUNKIN' DONUTS SHOP and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation, and repair, as reasonably required by DUNKIN' DONUTS.

Section 9.B.1 of the franchise agreements provides for a 24–hour cure period for any violations of any standard relating to health, sanitation, or safety. Moreover, upon the failure of a franchisee to cure a violation in the prescribed cure period, Dunkin' has the right pursuant to Section 9.D of the franchise agreement to terminate the franchise agreement.

Plaintiffs have presented a substantial number of photographs taken by Polizotto upon his re-inspection of the premises to supplement the check-list inspection and re-inspection reports he prepared during his visits to the three bakery locations. Defendants do not dispute the fairness and accuracy of the photographs. The photographs depict rusty shelves, broken floor tiles, freezers filled with condensation, dirty drains, muddy floors, dusty lights, bathroom-wall graffiti, filthy bathrooms, and dirty rags, and food with thermometers in them registering impermissibly high temperatures. These pictures were taken, as the defendants concede, at the time of the re-inspection, when defendants were on notice of the conditions of the three donut shops at the time of the unannounced initial inspections. The inspections at all three stores resulted in a variety of violations related to the health, sanitation, and safety. Defendants do not dispute that these violations existed at the time of inspection, continued to exist upon re-inspection, and existed still on July 6, 2001, when defendants received the Franchise Termination Notices.[13]

---

**13.** Defendants do not even allege that these violations are cured today. If they were to make this argument, however, it would be of

Defendants' contention that the violations were minor and trivial is not persuasive. The agreements contain no exception for minor and trivial violations. It is well settled that "the Court's function in construing a contract is to give effect to the clear agreement made by the parties and not to fashion a new set of obligations." *Dunkin' Donuts Incorporated v. Priya Enterprises Inc.*, 89 F.Supp.2d 319, 323 (E.D.N.Y.2000) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)); *see also Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 634 N.Y.S.2d 669, 658 N.E.2d 715 (1995). And, in any event, as held in *Priya Enterprises* "unsatisfactory sanitary practices—such as failing to clean food preparation equipment—in a business selling food to the public can [never] be considered *de minimis*." *Id.* at 323. Courts in a number of jurisdictions have recognized that a franchisee's failure to comply with health, safety, and sanitation standards set forth in a franchise agreement constitutes a material breach of the franchise agreement, sufficient to justify its termination. *See, e.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir.1998) (stating that the "failure to comply with ... food safety standards constituted a material breach of the franchise agreement sufficient to justify termination"); *BeerMart, Inc. v. Stroh Brewery Co.*, 804 F.2d 409 (7th Cir.1986) (holding that a beer distributor that sold expired products breached the franchise agreement resulting in its termination); *Dayan v. McDonald's Corp.*, Bus. Franchise Guide (CCH) ¶ 8223 (Ill.Ct.App.1984) (terminating franchise agreement for failing to maintain quality, service, and cleanliness standards at McDonald's restaurants).

Defendants' argument that the violations were too serious to be remedied in a 24–hour period is no more persuasive. The three Default–Cure Notices delivered to the franchises at the time of the first inspections provided a term that modified and excused the 24–hour cure period in the franchise agreement, provided that the franchisee "immediately contact[s][its] Business Consultant to discuss the matter and to request an extension of time to cure the deficiency." Defendants make no showing that they made this effort. Defendants' argument that they are "on the eve" of extensive renovations that would have cured all the major violations documented on inspection, like cracked floor tiles and peeling paint, which defendants allege were caused not by sanitation violations but, rather, the age of the premises, does not excuse them from a breach of the franchise agreement. Defendants' allegations that they have already invested substantial sums in the proposed renovations of the Jackson Heights and Freeport Shops, similarly does not excuse them from the operation of their business in violation of the franchise agreements.

Defendants' final argument that the Default–Cure Notices that Polizotto left at each store on the date of each store's initial inspection were not served on the defendants in a manner provided by the franchise agreements. According to Polizotto, after he completed his initial inspections at all three franchise locations, he hand delivered a Default–Cure Notice to the defendants. All of the Default–Cure Notices included the following language: "This Notice and Inspection Report is being hand delivered this [date] to you as Franchisee or in care of your employee

---

little effect. The reasonableness of Dunkin's termination of the franchise must be judged on the date which the notice of termination is served. *See Priya*, 89 F.Supp.2d at 323 ("Once aware of Priya's violation of the fran-

chise agreement, nothing required Dunkin' Donuts to re-inspect the shops before filing suit, and the Court will not read such a requirement into the agreement.").

identified below. EMPLOYEES HAVE BEEN INSTRUCTED TO DELIVER THIS NOTICE OR NOTIFY THE FRANCHISEE IMMEDIATELY." All three Default–Cure Notices were signed at the bottom on the line entitled "Franchisee/Employee in Charge." Defendants make no showing that the notices were not personally delivered to them by the employees who undertook to deliver them.

Section 13 of all three franchise agreements provides:

> All notices hereunder by DUNKIN' DONUTS to FRANCHISEE shall at DUNKIN' DONUTS' option be personally delivered or sent by telecopier, or prepaid private courier, or certified mail to the FRANCHISEE at the address set forth below or at such other address as FRANCHISEE may from time to time give notice of to DUNKIN' DONUTS.

In all three franchise agreements, the term "FRANCHISEE," as used in the franchise agreements, includes Park or Lim or both, and the corporate defendant.[14] Furthermore, Section 5 of the franchise agreements provides that the franchisee covenants to "manage the DUNKIN' DONUTS SHOP at all times with at least two (2) individuals, one of whom must be the FRANCHISEE or a partner or shareholder of FRANCHISEE."

2. *Infringement.* For the same reasons that plaintiffs have demonstrated a likelihood of success on their breach of contract claims for relief, plaintiffs have also demonstrated a likelihood of success on the claims of trademark infringement and trade dress infringement.

■■■ To prove a violation of Section 32 of the Lanham Act for trademark infringement, Dunkin' must establish that defendants used plaintiff's valid trademark in a way that is likely to confuse consumers as to the source of the product. *See U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986). To prevail in an action for trade dress infringement under Section 43 of the Lanham Act, a plaintiff must demonstrate that (1) its trade dress is distinctive and (2) there exists a likelihood of confusion between its product and the alleged infringer's product. *See Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 407 (2d Cir.1997).

■ Dunkin's' marks have been properly registered in accordance with the Lanham Act and the "existence of a trademark registration is prima facie evidence of a valid trademark." *See Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*, 875 F.Supp. 966, 975 (E.D.N.Y.1994).[15] Plaintiffs have used and continue to use these marks in offering doughnuts and related products for sale continuously since approximately 1960.

■ Presently, defendants continue to do business as a doughnut shop and are holding themselves out to be Dunkin' Donut retail shops, despite being in violation of their franchise agreements, which explicitly provides that they cease the use of

---

14. Specifically, the term FRANCHISEE refers collectively to: Park, Lim, and Northern Queens Bakery, Inc. in the Jackson Heights Franchise Agreement; Lim and the Freeport Long Island Bakery Corp. in the Freeport Franchise Agreement; and Park, Lim, and the Astoria Queens Bakery Corp. in the Astoria Franchise Agreement.

15. Defendants challenge Dunkin's ownership of the trademarks at issue on the basis that the registration issued by the United States Patent and Trademark Office states that the marks belong to an entity called Dunkin' Donuts of America, Inc. Plaintiffs have subsequently provided documentation and affidavits in the form of a Certification by Jack Laudermilk, Assistant General Counsel for Allied which establish plaintiff Dunkin' Donuts Incorporated's rights to the trademarks at issue.

the Dunkin' Donut marks. There is a " 'great likelihood of confusion when the infringer uses the exact trademark' as the plaintiff." *S & R Corp. v. Jiffy Lube Int'l, Inc.* 968 F.2d 371, 375 (3d Cir.1992) (quoting *Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 195 (3d Cir.1990)). In such cases, "likelihood of confusion is inevitable." *Opticians,* 920 F.2d at 195. In fact, "[c]ases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut.'" *Id.* (quoting *McCarthy, Trademarks and Unfair Competition*). Indeed, defendants' status as a holdover franchisee makes the Second Circuit's eight-factor test set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961), not applicable. Here, defendants are using the exact same mark as they used when they were properly franchised, which will generate confusion among Dunkin' Donut customers as to the source of defendants' goods and services.

## CONCLUSION

For the reasons stated herein, plaintiffs' request for a preliminary injunction, preventing the defendants from using, displaying or otherwise infringing on any of the Dunkin' Donut registered trademarks, is granted.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

## PRELIMINARY INJUNCTION ORDER

For the reasons set forth in this Court's Memorandum and Order of even date herewith, granting plaintiffs' motion for a preliminary injunction, it is hereby

ORDERED that defendants and all those in active concert or participation with them be and hereby are, pending further order of this Court or the trial of this matter, restrained and enjoined on or after December 21, 2001, at 5:00 p.m. from:

(i) using, displaying, or otherwise infringing upon the trademarks, trade name, and trade dress of Dunkin' Donuts; or using or displaying any other name, mark, or trade dress that is confusingly similar to the trademarks, trade name, and trade dress of Dunkin' Donuts;

(ii) using, displaying, or otherwise infringing upon the trademarks, trade name, and trade dress of Dunkin' Donuts; or using or displaying any other name, mark or trade dress that is confusingly similar to the trademarks, trade name, and trade dress of Dunkin' Donuts; and it is hereby further

ORDERED that the effectiveness of this preliminary injunction be conditioned upon plaintiffs' posting a bond in the amount of Twenty–Five Thousand ($25,-000) Dollars for the payment of such costs and damages as may be incurred or suffered by defendants in the event they are found to have been wrongfully enjoined or restrained.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.